**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JANICE MURRAY,** *et al.*, | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 14-378 (JEB)** |
| **AMALGAMATED TRANSIT UNION,** | |
| **Defendant.** | |

## MEMORANDUM OPINION

In this labor dispute, Plaintiffs Janice Murray and Tim Queen challenge the lawfulness of an election-eligibility ruling made by Defendant Amalgamated Transit Union, claiming that it violated the Labor-Management Reporting and Disclosure Act of 1959 as well as its own constitution.  On December 19, 2014, the Court denied the parties' cross-motions for summary judgment, holding that material facts remain in dispute.  Plaintiffs have now moved for reconsideration.  Although the Court declines the invitation to alter its prior decision, it avails itself of this opportunity to clarify its response to certain arguments.

## I.     Background

The background of this case is set forth more fully in the Court's Opinion denying summary judgment.  See ECF No. 42 (December 19, 2014, Memorandum Opinion).  To recap briefly, Plaintiffs are longstanding members of Local 1300, a public-sector affiliate of the ATU that represents employees of the Maryland Transit Administration.  See id. at 2.  The Local is governed by an Executive Board, which is elected by the membership on a triennial basis.  See id.  In June of 2013, when Local 1300 conducted its most recent election, Murray and Queen were duly nominated for and elected to the respective offices of President and Vice-President.

1

See id. at 6.

Upon learning of the results, runner-up presidential candidate and former President David McClure promptly challenged Plaintiffs' victory.  See id.  Under the ATU Constitution, union members lose their "good standing" – and are thereby rendered ineligible for office – when they fail to pay dues or any other "monies owed the Union."  Compl., Exh. 3 (ATU Constitution), §§ 14.2, 21.9.  McClure argued that both Murray and Queen had failed to discharge years-old arrearages.  See December 19, 2014, Mem. Op. at 6-7.  According to his timely challenge, Plaintiffs had improperly received automobile-mileage reimbursements from the Local in connection with a 2008 union event in Allentown, Pennsylvania, to which they had traveled as passengers.  See id. at 7.  McClure claimed that they subsequently refused to return the funds after he – as then-President of the Local – demanded they do so, and after the ATU's then-International President endorsed his position.  See id. at 4-5, 7.

The ATU's new International President, Lawrence Hanley, sided with McClure, concluding that Murray and Queen were obligated to repay the Allentown mileage stipends, and that their subsequent failure to do so over the course of several years rendered them members not in good standing and thus ineligible to hold elected positions in the Local.  See id. at 8, 20. Piqued by their unceremonious expulsion from office, Plaintiffs brought suit against the ATU challenging the ruling.  See id. at 9.  Count One of their Complaint alleged that Hanley had violated § 101(a)(5) of the LMRDA by "disciplin[ing]" Murray and Queen without providing the requisite procedural protections.  See 29 U.S.C. § 411(a)(5) ("No member of any labor organization may be . . . disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.").  In Count

2

Two, they claimed that Defendant had breached its contractual duties under the ATU

Constitution by improperly deeming them ineligible for office.  After conducting some

discovery, both sides moved for summary judgment.  Agreeing with Plaintiffs on some issues

and Defendant on others, the Court ultimately concluded that judgment as a matter of law was

unwarranted on either count.

   It first considered Plaintiffs' invocation of § 101(a)(5) of the LMRDA.  The ATU did not

dispute that Hanley had failed to provide Murray and Queen with the procedural safeguards

mandated by that section prior to deeming them ineligible for office.  Defendant instead

contested whether § 101(a)(5)'s protections were applicable here, claiming that: (1) its actions

fell within that section's explicit nonpayment-of-dues exception; (2) President Hanley's election

determination did not interfere with Plaintiffs' rights as "members" of the union, as required

under the statute; and (3) his determination was not "disciplinary" in the sense contemplated by §

101(a)(5).  See December 19, 2014, Mem. Op. at 13.  After quickly dispensing with the ATU's

first two assertions, the Court turned to its last, and best, point – whether Hanley's ineligibility

ruling constituted discipline.

   To analyze that argument, the Opinion first teased out the governing law, explaining that

a union's "'fair[]'" and "'even-handed'" application of a reasonable classification rule is not

considered discipline under § 101(a)(5).  See id. at 18-19 (quoting Macaulay v. Boston

Typographical Union No. 13, 692 F.2d 201, 204 (1st Cir. 1982)).  Armed with that framework,

the Court considered two distinct questions: (1) whether Hanley reasonably determined that

Plaintiffs actually owed the mileage reimbursements; and (2) if so, whether he fairly determined

that their failure to repay the sums rendered them ineligible for office under the ATU

Constitution.  See id. at 20-22.  The Court answered the first question in the affirmative, stating

3

that it could not "find fault with Hanley's determination insofar as he concluded that the 2009 letters from George and McClure obligated Plaintiffs to repay the Allentown mileage reimbursements." Id. at 20.  It concluded, however, that the parties had "raised triable issues of fact with respect to the fundamental fairness" of Hanley's ineligibility ruling that precluded it from determining whether such ruling amounted to discipline for purposes of § 101(a)(5).  See id. at 19-20.  In particular, noted the Opinion, the parties vehemently disagreed on the highly pertinent issue of whether Murray and Queen had, in fact, attempted to return the disputed sums. See id. at 20-22.  Plaintiffs claimed they had repeatedly tried to make good on the delinquencies in 2009 yet been rebuffed by union officers, while the ATU rejoined that neither Murray nor Queen had endeavored to pay back the sums until the election challenge in 2014.  See id.  Should a jury credit Plaintiffs' account, it could easily find that Hanley had acted in "a wholly unjust manner" by deeming them ineligible for office.  Id. at 21.

Finally, with regard to the second count, the Court found that those same factual disputes precluded it from assessing the reasonableness of Hanley's ineligibility determination under the ATU Constitution.  See id. at 24-25.  Murray and Queen now ask the Court to reconsider and clarify particular aspects of its ruling.

## II.    Legal Standard

Because Plaintiffs seek reconsideration of an interlocutory order denying their Motion for Summary Judgment, Federal Rule of Civil Procedure 54(b) governs the Court's analysis.  See Judicial Watch v. Dep't of Army, 466 F. Supp. 2d 112, 123 (D.D.C. 2006) (discussing Rule 54(b)'s application to denials of dispositive motions).  "The standard of review for interlocutory decisions differs from the standards applied to final judgments under Federal Rules of Civil Procedure 59(e) and 60(b)."  Williams v. Savage, 569 F. Supp. 2d 99, 108 (D.D.C. 2008).  Such

decisions may be reconsidered "as justice requires," a standard that affords a court wide latitude in exercising its discretion. See Cobell v. Norton, 224 F.R.D. 266, 272 (D.D.C. 2004). Its task, essentially, is to determine "'whether [relief upon] reconsideration is necessary under the relevant circumstances.'" Lewis v. Dist. of Columbia, 736 F. Supp. 2d 98, 102 (D.D.C. 2010) (quoting Cobell, 224 F.R.D. at 272).

A court's discretion under Rule 54(b), however, is "limited by the law of the case doctrine and subject to the caveat that where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." Singh v. George Washington Univ., 383 F. Supp. 2d 99, 101 (D.D.C. 2005) (internal citations omitted). "[A]s a rule a court should be loathe to revisit its own prior decisions in the absence of extraordinary circumstances . . . ." Brookens v. United States, No. 12-502, 2015 WL 1359631, at *1 (D.D.C. Mar. 24, 2015) (internal quotation marks and alterations omitted). Accordingly, a court will ordinarily grant a motion for reconsideration of an interlocutory order "only when the movant demonstrates: (1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error in the first order." Stewart v. Panetta, 826 F. Supp. 2d 176, 177 (D.D.C. 2011) (quoting Zeigler v. Potter, 555 F. Supp. 2d 126, 129 (D.D.C. 2008)). Murray and Queen premise the instant motion on the third ground – i.e., clear error. See Reply at 1.

## III.    Analysis

In seeking reconsideration, Plaintiffs offer two principal contentions. They assert first that the ATU's ineligibility determination constituted discipline as a matter of law under § 101(a)(5), and, second, that the prior Opinion failed to address several of their alternative arguments. The Court treats each in turn.

A.  <u>Discipline Under § 101(a)(5)</u>

Murray and Queen initially submit that the very existence of the factual dispute highlighted by the Court renders the ATU's ineligibility determination "discipline <u>as a matter of law</u> for purposes of" the LMRDA.  Mot. at 2.  The rule, say Plaintiffs, is that a union must conduct a due-process hearing when faced with a factual dispute as to the basis for taking adverse action.  <u>See</u> <u>id.</u>; Reply at 2.  Defendant, for its part, maintains that no such categorical rule exists.  <u>See</u> Opp. at 4.

Mindful of the "clear error" standard that governs this Motion for Reconsideration, the Court cannot conclude that the weight of authority mandates a reversal of course.  It recognizes that some of the cases cited by Plaintiffs suggest that the presence of disputed facts necessarily renders adverse union action "discipline."  In <u>Figueroa v. Nat'l Mar. Union of Am., AFL-CIO</u>, 342 F.2d 400 (2d Cir. 1965), for example, the court declined to categorize the union's refusal to register and refer the plaintiffs for employment as "discipline," emphasizing that they had admitted having disqualifying convictions for narcotics.  <u>See</u> <u>id.</u> at 406.  It noted, however, that "[h]ad appellees disputed the fact of their convictions, the determination by the Union or its agent that they had been convicted would, of course, have constituted 'discipline' entitling the members to the procedural safeguards of Section 101(a)(5)."  <u>Id.</u>  That statement, albeit dicta, was cited approvingly in <u>Williams v. Int'l Typographical Union, AFL-CIO</u>, 423 F.2d 1295 (10th Cir. 1970).  There, in finding that a membership reclassification did not amount to discipline, the court similarly emphasized that the plaintiff had conceded the factual basis for his reclassification, and that the "admission [had] precipitated the reclassification."  <u>Id.</u> at 1297; <u>see also, e.g.</u>, J. Ralph Beaird & Mack A. Player, <u>Union Discipline of its Membership under Section 101(a)(5) of Landrum-Griffin: What is "Discipline" and How Much Process is Due?</u>, 9 Ga. L.

Rev. 383, 397 (1975) ("If . . . the rule is valid and the facts admitted make the rule applicable, [§ 101(a)(5)] does not require a full evidentiary hearing, and the court, as a matter of law, need not order one. . . . If there is a factual dispute as to whether the rule applies to the particular member, [§ 101(a)(5)] is fully applicable . . . .").

On the other hand, authority cited by Defendant indicates that the presence of some factual dispute is not necessarily dispositive as to the nature of the union's action for purpose of § 101(a)(5). For example, in Galke v. Duffy, 645 F.2d 118 (2d Cir. 1981), a Second Circuit case postdating but not mentioning Figueroa, the majority declined to categorize a seniority reclassification as "discipline" even though the plaintiff had directly disputed the facts that supported the application of the regulation to him – both prior to his reclassification and during a trial before the district court. See id. at 119-20; see also id. at 121 (Oakes, J., dissenting). Similarly, in Macaulay, the First Circuit held that a priority reclassification was not discipline even though the plaintiff had contested the union's fairness in enforcing the pertinent rule. See 692 F.2d at 204; see also Macaulay v. Boston Typographical Union No. 13, 474 F. Supp. 344, 347 (D. Mass. 1979), aff'd, Macaulay, 692 F.2d 201. Even Williams, one of the cases upon which Plaintiffs principally rely, stated that the plaintiff's prior admission of the relevant facts was only of "some importance" to its resolution of the discipline question. See 423 F.2d at 1297.

Given this hazy landscape and the breadth of the rule they seek to impose, Plaintiffs have failed to establish that the Court clearly erred in denying their Motion for Summary Judgment. On the contrary, the dispute underlying the "discipline" issue presents a classic factual question that the Court continues to believe is appropriately resolved by a jury.

B.  <u>Obligation to Repay Stipends</u>

Murray and Queen also seek clarification regarding whether the Court has considered and rejected certain arguments they raised during summary-judgment briefing.  In Section III.B of their Opposition and Reply, Plaintiffs presented five distinct arguments as to why the dues-nonpayment exception in § 101(a)(5) of the LMRDA was inapplicable.  <u>See</u> ECF No. 34 (September 23, 2014) at 17.  Because the Court agreed with their first point – *i.e.*, the construction of the statute – it did not explicitly rule on their four alternative ones in disposing of Defendant's nonpayment-of-dues defense.  <u>See</u> December 19, 2014, Mem. Op. at 13-16.  Nor did the Court consider the potential application of those points more broadly, given the manner in which Plaintiffs had structured their briefing.

They now note that those remaining arguments also relate to the Court's analysis of a separate defense raised by the ATU – namely, that Hanley's ineligibility determination did not constitute "discipline" within the meaning of § 101(a)(5).  To recap briefly, the prior Opinion bifurcated that issue into two sub-questions: (1) whether Hanley reasonably determined that Murray and Queen were obligated to return the mileage reimbursements ("the arrearage question"); and (2) if so, whether he fairly determined that their failure to repay the sums rendered them ineligible for office under the ATU Constitution ("the ineligibility question").  <u>See</u> <u>id.</u> at 20-22.  The Court decided the first question in favor of Defendant, stating that it could not "find fault with Hanley's determination insofar as he concluded that the 2009 letters from George and McClure obligated Plaintiffs to repay the Allentown mileage reimbursements."  <u>Id.</u> at 20.  It elaborated as follows:

> McClure, acting as President of Local 1300 and within his
> authority to "to preserve order and enforce this Constitution and
> the local bylaws," ATU Const., § 13.9, expressly and individually
> sought repayment from both Murray and Queen.  And George, the

> ATU's International President, expressly ratified – in writing – the
> attempts to collect payment.  Both letters, moreover, correctly
> pointed out that the disbursement of "Personal Automobile
> Mileage" reimbursements to carpooling passengers was facially
> improper from the get-go.

Id.  It found that the second question, however, implicated disputed facts necessitating resolution

by a jury.  See id. at 20-22.

In their request for reconsideration, Murray and Queen claim that their remaining

nonpayment-of-dues arguments, if considered, serve to undermine the Court's resolution of the

arrearage question.  See Mot. at 10-11.  That is, they believe that these previously unaddressed

points demonstrate why – as a matter of law – they have never owed Local 1300 the sums in

question and, accordingly, were subjected to discipline within the meaning of § 101(a)(5).  See

id.  Their position is not frivolous; so, in the interests of both clarity and fairness, the Court will

briefly address their arguments here.  In doing so, it limits its analysis to the arrearage question,

as Plaintiffs have requested, notwithstanding that some points seem more apropos to the

fundamental fairness of Hanley's election ruling – i.e., the ineligibility question.

1. *Grace Period*

Plaintiffs first invoke 29 C.F.R. § 452.37(b), a regulation adopted by the Department of

Labor in service of its obligation to enforce 29 U.S.C. § 481(e), one of the election-related

provisions of the LMRDA.  That regulation, entitled "Continuity of Good Standing," states in

relevant part:

> A requirement of continuous good standing based on punctual
> payment of dues will be considered a reasonable qualification only
> if (1) it provides a reasonable grace period during which members
> may make up missed payments without loss of eligibility for office
> and (2) the period of time involved is reasonable.  What are
> reasonable periods of time for these purposes will depend upon the
> circumstances.

29 C.F.R. § 452.37(b) (footnote omitted).  Murray and Queen claim that the ATU failed to provide them with any reasonable grace period during which they could pay the delinquent sums without loss of eligibility for office.

This regulation proves no ace in the hole for Plaintiffs.  As a threshold matter, its relevance to this case is not entirely clear.  As Murray and Queen admit, § 452.37(b) was adopted to enforce the LMRDA's election-related provisions.  See September 23, 2014, Opp. & Reply at 23.  Those provisions are inapplicable to elections within local unions comprised solely of government employees, such as Local 1300.  See December 19, 2014, Mem. Op. at 12.  It stands to reason that the regulation may be similarly inapposite.

Even assuming, however, that its "reasonable grace period" requirement governs the ATU's ineligibility determination here, Plaintiffs cannot cry foul with a straight face.  The written demands for repayment from Local 1300's then-President, and the ratification of those efforts by the International Union's then-president, occurred in 2009.  See id. at 4-5.  Murray and Queen were not deemed ineligible for office until February 2014.  See id. at 8.  Thus, in point of fact, they had a "grace period" of several years, not just months or days, in which they could have made repayment after being notified of their delinquency.  Plaintiffs point to no authority suggesting that such an extended period of time could possibly be considered inadequate for purposes of 29 C.F.R. § 452.37(b).

They instead rejoin that the Local's protracted delay in taking action somehow mars their receipt of a reasonable grace period.  See September 23, 2014, Opp. & Reply at 22-23 & n.11.  That the Local did not sooner impose consequences for their arrearage, however, was a lucky break for Murray and Queen – it did not alleviate them of their responsibility to comply with the clearly expressed demands for repayment or otherwise suggest that no repayment was required.

In a final attempt to revive this theory, Plaintiffs argue that the demands for repayment were flawed – to wit, because they failed to specify the exact amount to be returned and the date by which the money was due the Local.  See id. at 22.  They also assert that their attempts to return the sums were thwarted by various union officials.  See id. at 23.  Those arguments, however, raise precisely the same factual issues that the Court deemed ripe for resolution at trial, see December 19, 2014, Mem. Op. at 20-22, and it sees no reason to alter that conclusion now.

### 2. *Check-Off Procedure*

Murray and Queen next point to identical "Check-Off Authorizations" they both signed in the late 1980s, which authorized Local 1300 to effect payment of their dues by way of deduction from their wages.  See September 23, 2014, Opp. & Reply at 24-25; see also Pl. Mot. for Summary Judgment, Exh. M (check-off form).  If, say Plaintiffs, the outstanding mileage payments are considered "dues" under the ATU Constitution, as the union now claims, Local 1300 could have deducted those monies from their paychecks.  See ATU Const., § 21.9 (defining "dues" as "all monies owed the Union by a member").  Because it failed to do so, Hanley's determination that Plaintiffs were in arrears could not have been reasonable as a matter of law.

The Court cannot agree.  Regardless of the status of the mileage stipends under the ATU Constitution, they in no sense resemble the ordinary, noncontroversial monthly dues owed by all union members for which the check-off forms were designed.  On the contrary, they were a peculiar, one-time obligation that both Murray and Queen hotly disputed.  As a consequence, the union's decision to seek voluntary repayment directly from Plaintiffs rather than deducting the disputed sums from their salaries – over their objections – was appropriate and even admirable.  To find that such moderate behavior somehow estops the ATU from holding them responsible for the delinquency would be nonsensically draconian.

In a similar vein, although Plaintiffs cite several cases holding that a union's default in utilizing a dues check-off arrangement estops it from premising ineligibility on financial delinquency, each of those cases concerned a union's failure to deduct the periodic monthly dues owed as an ordinary incident of membership.  See English v. Cunningham, 282 F.2d 848 (D.C. Cir. 1960); Wirtz v. Local 191, Int'l Bhd. of Teamsters, Chauffers, Warehousemen and Helpers of Am., AFL-CIO, 226 F. Supp. 179 (D. Conn. 1964); Dole v. Local 512, Int'l Bhd. of Teamsters, Chauffers, Warehousemen and Helpers of Am., AFL-CIO, 730 F. Supp. 1562 (M.D. Fla. 1990).  The Court thus finds them unpersuasive under the circumstances here.

### 3. *Voluntary-Payment Doctrine*

Hitless on their first two arguments, Plaintiffs seek to get on base via Maryland's voluntary-payment doctrine.  Under that hoary principle, which dates back to the 1840s, "'a party cannot recover money voluntarily paid with a full knowledge of all the facts, although no obligation to make such payment existed.'"  Halle Dev., Inc. v. Anne Arundel Cnty., 371 Md. 312, 322 n.16 (2002) (quoting Baltimore & S.R. Co. v. Faunce, 6 Gill 68 (1847)).  Indeed, under Maryland law, "no principle is better settled than that where a person, with full knowledge of the facts, voluntarily pays a demand unjustly made upon him, . . . it will not be considered as paid by compulsion, and the party thus paying [] is not entitled to recover. . . ."  Furman v. Lanahan, 159 Md. 1, 2-3 (1930) (internal citation omitted).

Here, Local 1300's Executive Board disbursed the 2008 Allentown mileage payments to Murray and Queen with full knowledge of the relevant facts – namely, that the Local's officers had a longstanding practice of carpooling to events and thus might be reimbursed for miles not actually driven.  Because the monies were freely given notwithstanding such knowledge, Plaintiffs maintain that the "voluntary payment rule applies with full force" – that is, they were

never "legally obligated" to repay the mileage payments to Local 1300.  See Pl. Mot. for

Summary Judgment at 20; see also September 23, 2014, Opp. & Reply at 26-29.  As such, the

disputed amounts were not monies "owed" the Local under § 21.9 of the ATU Constitution and

were thus incapable of undermining their good standing.

This argument, like its predecessors, misses the mark.  As made clear by the body of

caselaw expounding upon it, the voluntary-payment doctrine serves as an affirmative defense in

a legal action brought to recover disputed sums.  See, e.g., Rapley v. Montgomery County, 261

Md. 98, 106 (1971) ("This Court has consistently recognized the rule that money paid

[voluntarily] . . . ordinarily cannot be recovered in an action at law, nor can recovery ordinarily

be had in equity, in the absence of special circumstances."); Awalt v. Eutaw Building Ass'n., 34

Md. 435, 437 (1871) (stating that "no action will lie" to recover sums falling within the

parameters of the voluntary-payment doctrine).  Had the ATU brought a debt-collection action to

recoup the mileage payments, for instance, the doctrine might have some resonance.

But that hypothetical, of course, is not the instant case.  Instead, the ATU – a voluntary

organization – is simply seeking to apply its internal rules to individuals who, by joining the

Union and seeking office, consented to eligibility standards that may differ from or exceed what

external law may require in other transactions.  Although Plaintiffs attempt to argue that the

voluntary-payment doctrine is a "rule of substantive law" that operates to control even the

interpretation and application of such internal rules, see September 23, 2014, Opp. and Reply at

26, none of the authority cited by Plaintiffs provides support for that counterintuitive proposition.

Given that well-established federal law requires "considerable deference" to the ATU's

interpretation of its Constitution, Monzillo v. Biller, 735 F.2d 1456, 1458 (D.C. Cir. 1984), the

Court sees no reason to override Hanley's reasonable determination that sums improperly

13

disbursed and repeatedly demanded back constitute monies "owed" the union under § 21.9 – regardless of whether such funds would be recoverable in court as a matter of Maryland state law.

### 4. Caravan *and* Howard

Finally, in Section III.B.V of their Opposition and Reply, Murray and Queen state:

> [T]he dues nonpayment exception does not apply to situations where, as in this case, (a) the union's determination that the member has failed to pay dues is based on facts indicating that the unpaid monies at issue are not normal, periodic membership dues, but rather monies which are only allegedly owed (as in [Caravan v. Reading Typographical Union No. 86, 381 F. Supp. 14 (E.D. Pa. 1974)]) or (b) the member has been misled into believing that he or she does not owe any dues, (as in [Howard v. United Ass'n of Journeymen, 560 F.2d 17 (1st Cir. 1977)]).

Id. at 29.  These arguments, as framed and as confirmed by the cases on which they rely, clearly and particularly relate to the applicability of the "nonpayment of dues" exception in § 101(a)(5). See Howard, 560 F.2d at 21 (focusing on that exception); Caravan, 381 F. Supp. at 20 (same). The Court finds it difficult to discern how exactly Plaintiffs intend these arguments – especially the first – to relate to the wholly separate question of their obligation to return the mileage reimbursements as a result of the 2009 demands for repayment.  Regardless, insofar as these points rest on the same factual issues that have already been earmarked for a jury's assessment – namely, Plaintiffs' reasons for failing to return the money and whether their attempts to do so were thwarted by the Local, see September 23, 2014, Opp. & Reply at 31 – the Court believes no further discussion is warranted.

## IV.    Conclusion

For the foregoing reasons, the Court will issue a contemporaneous Order denying

Plaintiffs' Motion for Reconsideration.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  April 20, 2015