**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **JANICE MURRAY,** *et al.*, |
| **Plaintiffs,** |
| v. |
| **AMALGAMATED TRANSIT UNION,** |
| **Defendant.** |

Civil Action No.  14-378 (JEB)

## MEMORANDUM OPINION

If there is a lesson to be learned from this labor dispute, it is a simple one: pay your bills

on time.  In 2013, Plaintiffs Janice Murray and Alnett (Tim) Queen were the short-lived victors

of a triennial union election held by Local 1300 of the Amalgamated Transit Union.  Murray

became President and Queen Vice President.  The second-place candidate for President,

incumbent David McClure, immediately challenged the election results, contending that Murray

and Queen were ineligible given that each had an outstanding debt to the Union of $175.50 for

unrepaid travel expenses.  The ATU agreed with McClure that such debts rendered Plaintiffs not

in "good standing" with the Union; as they could thus not stand for office, their election was

invalidated.  Plaintiffs responded by suing the ATU for violating the Labor Management

Reporting and Disclosure Act of 1959 and for breaching their contract rights under the ATU's

constitution.

In December 2014, this Court denied the parties' early-stage cross-motions for summary

judgment, and it also denied Plaintiffs' motion for reconsideration in April 2015.  With both

sides having now concluded a more extensive round of discovery, Defendant again seeks

summary judgment, presenting only two issues for decision. The first is whether the ATU

violated Plaintiffs' contractual and statutory rights by voiding the 2013 election results on the basis of their outstanding debts. Because material disputes of fact remain, the Court concludes, Plaintiffs are entitled to go to trial on this question of liability. The second is whether damages are an appropriate remedy in these circumstances at all and, if so, what form they may take. While the Court agrees with Defendant that no punitive damages are permissible here, it cannot so determine on the question of compensatory damages.

## I.    Background

Most of the relevant facts are undisputed, and the liability question is nearly identical to the one addressed by the Court in its first summary-judgment Opinion. See Murray v. Amalgamated Transit Union, No. 14-378, 2014 WL 11281392 (D.D.C. Dec. 19, 2014). The parties have nevertheless spilled much ink in their voluminous and footnote-infested briefings on ground already trodden. A particular offender on this point is Defendant's 50-page opening brief, which egregiously sought to create even more room by shrinking its line spacing and cramming digressive materials into 41 often-lengthy footnotes.

In any event, as much of this background has already been covered, the Court will endeavor to offer a more focused treatment of the facts relevant here – setting them forth in the light most favorable to Plaintiffs – and directs the reader to its December 2014 Opinion for a more comprehensive discussion of this case's factual and legal background. See Murray, 2014 WL 11281392, at *1-5.

### A. Key Players

The crux of this intra-union dispute is Local 1300's 2013 election, in which Plaintiffs Murray and Queen won the vote for President and Vice President but were subsequently

dethroned.  Before diving into the chronology, however, the Court finds it helpful to introduce

the cast of characters and the positions they occupied during the relevant time period:

- **Janice Murray** (Plaintiff): Longtime member of Local 1300, Vice President of Local 1300 from July 2004 to June 2007, Recording Secretary from July 2007 to June 2010, and President from July 2013 until the results of that election were voided by ATU International in February 2014.  See Plaintiffs' Statement of Facts, ¶ 5.  Murray also unsuccessfully ran for President in June 2010 against David McClure.  Id., ¶ 36.  She held no position in Local 1300 between July 2010 and June 2013.  Id.

- **Tim Queen** (Plaintiff): Another longtime member of Local 1300.  Vice President of Local 1300 from July 2007 until his removal in February 2014.  See id., ¶ 5.

- **William Lovelace**: Financial Secretary/Treasurer of Local 1300 from July 2007 to June 2010.  See id., ¶ 36.  Lovelace was on the same slate as Murray for their successful bid in June 2007 and their unsuccessful one in 2010 for President and Treasurer.  Id.

- **David McClure**: President of Local 1300 from July 2007 to June 2013, see Murray, 2014 WL 11281392, at *3, and again from March 2014 to present, following Murray's ouster in February 2014.  See PSOF, ¶ 57.

- **Bertrand DeLoatch**: Financial Secretary/Treasurer of Local 1300 from July 2010 to present.  See MSJ at 3; PSOF, ¶¶ 31, 41.

- **Warren George**: President of ATU International in 2009 up to September 2010.  See PSOF, ¶¶ 3, 17, 59.

- **Larry Hanley**: President of ATU International from September 2010 to present.  See Opp., Exh. 1 (Deposition of Larry Hanley) at 10:1-17.

B.  Mileage-Reimbursement Dispute

The seeds of this 2013 election dispute were planted way back in 2009, when McClure,

then-President of Local 1300, took issue with an expense-reimbursement practice that the Local

had been using for some time.  Before 2009, whenever an officer would travel out of state on

business, the Local would "reimburse" her using the IRS's standard mileage rate as a guide.  See

Murray, 2014 WL 11281392, at *1; PSOF, ¶ 14; see also Rev. Proc. 2010-51, 2010-51 I.R.B.

883 ("The term 'standard mileage rate' means the amount the [IRS] provides for optional use by

taxpayers to substantiate the amount of . . . [d]eductible costs of operating for business purposes automobiles (including vans, pickups, or panel trucks) they own or lease . . . ."). Oddly, however, the Local would pay the officer for driving-related travel even if she were not driving her own car but rather were riding as a passenger in someone else's. See Murray, 2014 WL 11281392, at *2.

McClure understandably decided this practice was nonsense and in the summer of 2009 resolved to do something about it. He started off by writing a letter to then-officer Edgar Sewell (who otherwise plays no role in this litigation) demanding repayment of a mileage-reimbursement stipend Sewell had received for riding as a passenger in a car to a work-related event in Cleveland. See id. Sewell balked, and Local 1300's Executive Board – i.e., the governing body of officers – somehow agreed with Sewell that the practice was sound. See id.

Dissatisfied, McClure next wrote to then-President of the ATU, Warren George, asking him to weigh in "on the validity" of the practice. Id. George sided with McClure, writing back in a September 23, 2009, letter that the Local's practice was "disingenuous" and suggesting that it be curtailed because it "provides certain individuals with 'expense reimbursement' payments from the Local 1300 treasury for expenses not actually incurred." ECF No. 28, Exh. I (Letter from Warren George to David McClure) at 1-2.

With George's backing in hand, McClure then went after five officers – including both Plaintiffs – for recent trips in which they had accepted mileage reimbursements for traveling as passengers. See PSOF, ¶ 19. As to Murray and Queen, he wrote each a letter demanding that they repay the stipends they had received for carpooling to an event in Allentown, Pennsylvania, during the prior fiscal year. See id. (Although Plaintiffs assert that at the time McClure asked for repayment, they did not remember the precise stipend they had received in 2008 for the Allentown trip, the parties now agree with the fact that each received $175.50. See id., ¶ 14.) McClure

instructed them to deal with Lovelace, the Local's then-Treasurer, to work out the particulars of the reimbursements.  See id., ¶ 19.

Murray took issue with McClure's demand and, disinclined to back down, wrote to George herself on November 3, 2009.  She asked whether she was obliged to pay restitution retroactively – which would include stipends like the one she had received for the 2008 Allentown trip – or whether, in accordance with the Board's understanding of George's instructions, she was simply prohibited from obtaining such stipends in the future.  See id., ¶ 20; Murray, 2014 WL 11281392, at *2.

George wrote back on November 9, 2009, indicating that any "impression" that his guidance only applied prospectively was erroneous, and that the Local's prior practice was "simply inappropriate."  ECF No. 28, Exh. L (November 9, 2009, Letter from Warren George to Janice Murray).  In short, "[b]ecause any such 'reimbursements' were not justifiable," George could not "find fault with any efforts to obtain restitution of the amounts at issue where available information about the foundational circumstances is available [*sic*] to the local union."  Id.

C.  Attempts at Repayment

After receiving this clarification, Murray insists that she wanted to repay the amount, but that her efforts were stymied by both Lovelace and, quite counterintuitively, McClure.  See PSOF, ¶ 23.  This is the pivotal question concerning liability that is in dispute here.  She says she approached Lovelace at least twice – once in 2009 and again in early 2010 – about repaying the amount, but Lovelace told her he would not accept her money "without specific direction from McClure" that she pay it back.  Id., ¶ 24; see Opp., Exh. 5 (Deposition of William T. Lovelace) at 14:19-22 ("Janice came to me and wanted to pay me some money and I refused to take it . . . ."); id. at 87:2-6 ("[T]he second time Janice came in was . . . when I said, 'I'm not taking your money unless I take everybody's money.'").  According to Plaintiffs, McClure never gave

him such "specific direction," and thus Lovelace stood firm in his refusal to accept any money

from Murray.  <u>See</u> PSOF, ¶ 24 (indicating that McClure "never provided" an instruction to

Lovelace to recoup the improperly paid stipends); <u>but see</u> Lovelace Depo. at 87:2-92:15

(describing Board meeting in 2010 when McClure "brought [the stipend issue] up" and testifying

that "I said, . . . 'David, you received the same thing when you were on the Board and you ain't

paid anybody back.'  And he was the President then.'").

     Murray insists that her efforts did not end there.  She also claims to have approached

McClure himself "a couple of times" after Lovelace shut her down.  <u>See</u> Opp., Exh. 9

(Deposition of Janice Murray, Day 1) at 160:12; PSOF, ¶ 24.  As she recounts the

conversation(s), she told McClure that Lovelace would not tell her how much she owed for the

Allentown trip and asked him to provide her the answer.  <u>See</u> Murray Depo. Day 1 at 160:7-

161:18.  He either told her to take it up with Lovelace or ignored her and walked away.  <u>See</u> <u>id.</u>

     Unlike Murray, Queen does not claim to have had any direct contact with either Lovelace

or McClure about his debt.  Instead, he interfaced mostly with Murray, who relayed her failed

attempts at repayment and assistance, telling him that Lovelace would not accept any payment

until McClure told him otherwise.  <u>See</u> Opp., Exh. 2 (Deposition of Alnett T. Queen) at 63:10-

67:7.

     Ultimately, Murray did not pay the money back in 2010, 2011, 2012, or 2013.  <u>See</u>

PSOF, ¶ 24.  In February 2014, after the ATU made its ineligibility determination, Murray wrote

a check for $200 to Local 1300 as an estimate of what she owed and attached a letter requesting

a refund of any overpayment.  <u>See</u> PSOF, ¶ 55.  The Union deposited $175.50 and provided her a

refund of $24.50.  <u>Id.</u>  Queen, on the other hand, has still never paid any of the money back.  <u>See</u>

id., ¶ 22.

D.  Election Contest

In July 2013, one month after Murray and Queen won the election, McClure filed his challenge with the Local.  See PSOF, ¶ 43; see also Compl., Exh. 3 (ATU Const.), § 14.8 (A union member seeking to "challenge the conduct or results of an election" may do so by initiating a post-election challenge with the Local Union "within ten (10) days of the counting of the ballots.").  His theory was that Sections 14.2 and 21.9 of the ATU constitution rendered the victors ineligible to serve as officers, and that the election results were thus void.  See Murray, 2014 WL 11281392, at *3.  Section 14.2 requires, as a precondition of eligibility for office, that the Union member "have been a member in continuous good standing" throughout the two years preceding the date of the nomination meeting.  Section 21.9, in turn, specifies that a member is no longer in "good standing" when she fails to pay dues or any other "monies owed the Union," and the unpaid arrearage continues beyond a specified point.

McClure initially challenged the election before the Local's Executive Board and then directly with the Local's members, but both efforts were unsuccessful.  See PSOF, ¶ 44.  He then took the matter to the International, filing a letter appeal with the ATU's then-President Larry Hanley in August 2013.  See id., ¶¶ 44-45.  It is undisputed that Hanley started an investigation and, in February 2014, rendered a decision concluding that Plaintiffs were not "in good standing" and were thus ineligible for office.  See Murray, 2014 WL 11281392, at *4.  He then invalidated the 2013 election results, causing a rerun election and the elevation of McClure to the position of President in March of 2014.  See PSOF, ¶¶ 54, 57.

E.  Procedural History

Plaintiffs filed this lawsuit on March 10, 2014, against both the ATU and Local 1300,

seeking injunctive relief as well as damages.  The Court denied their motion for a temporary

restraining order – in which they sought to invalidate the rerun election – on March 18, 2014.

See Murray, 2014 WL 11281392, at *5.  Plaintiffs then amended their complaint, dropping Local

1300 as a defendant and asserting two counts against the ATU only.  Count I alleged that the

Union, via Hanley's good-standing decision, had violated § 101(a)(5) of the Labor-Management

Reporting and Disclosure Act by "disciplin[ing]" Murray and Queen without providing notice

and a hearing as required by that statute.  See 29 U.S.C. § 411(a)(5) ("No member of any labor

organization may be . . . disciplined except for nonpayment of dues by such organization or by

any officer thereof unless such member has been (A) served with written specific charges; (B)

given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.").  In Count

II, they claimed that Defendant had breached its contractual duties under the ATU constitution

by improperly deeming them ineligible for office, thereby stating a claim under § 301 of the

Labor Management Relations Act of 1947.  While both counts arose under distinct statutory

provisions, each was tethered to the question of whether the ATU had, under its own

constitution, properly or improperly vacated the election results on account of Plaintiffs'

outstanding debts.

    In July of 2014, the parties agreed that they would both file "early and potentially

dispositive cross-motions for summary judgment," deferring "initial disclosures, discovery

planning and other pre-trial matters" until resolution of those motions.  See ECF No. 27 (July 3,

2014, Joint Proposed Scheduling Order), ¶ 1.  The Court ruled on those cross-motions in

December 2014, concluding that disputes of material fact precluded it from granting summary

judgment to either side on both counts.  See Murray, 2014 WL 11281392, at *9-13.  (More on

that later.)

Plaintiffs were not satisfied with that equilibrium, however, and insisted in a February 2015 motion for reconsideration that they should win as a matter of law on at least Count I.  See ECF No. 44 at 2.  They raised a barrage of novel arguments but none proved persuasive to the Court, which denied their motion in April 2015.  See Murray v. Amalgamated Transit Union, 99 F. Supp. 3d 149, 158 (D.D.C. 2015).

Now armed with a full record of deposition testimony and paper evidence, Defendant again moves for summary judgment.

## II.    Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v.

Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*).  On a motion for summary

judgment, the Court must "eschew making credibility determinations or weighing the evidence."

Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party's opposition, however, must consist of more than mere

unsupported allegations or denials and must be supported by affidavits, declarations, or other

competent evidence, setting forth specific facts showing that there is a genuine issue for trial.

See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The nonmovant is

required to provide evidence that would permit a reasonable jury to find in its favor.  See

Laningham v. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  In light of this requirement, and

pursuant to Local Civil Rule 7(h) and Federal Rule 56(c), the Court, in resolving summary-

judgment motions, "assume[s] that facts identified by the moving party in the statement of

material facts are admitted, unless such a fact is controverted in the statement of genuine issues

filed in opposition to the motion."  LCvR 7(h)(1).

## III.    Analysis

Defendant offers two alternative arguments in support of its Motion, one on liability and

one on damages.  The Union first maintains that, as a matter of law, it did not violate its

constitution – and Plaintiffs were similarly not "disciplined" under the LMRDA – because no

reasonable jury could find that the ATU's eligibility determination was anything but a fair and

neutral application of a longstanding election-eligibility rule.  The ATU next contends that even

if the liability issues present triable questions of fact, damages are not an appropriate remedy

under the LMRDA; at the very least, certain types – *e.g.*, punitives – cannot be awarded.  The

Court treats each in turn, concluding that summary judgment is warranted only on the issue of

punitive damages, which it agrees are inappropriate in this case.

A. <u>Liability</u>

As a brief reminder, Section 14.2 of the ATU constitution requires that for "[a] member to be eligible for office," she must "have been a member in continuous good standing" for the two years preceding the date of the nomination meeting.  <u>See</u> ATU Const., § 14.2.  Section 21.9, in turn, provides that a member loses "good standing" status when she fails to pay dues or any other "monies owed the Union."  <u>Id.</u>, § 21.9.  President Hanley declared both Plaintiffs ineligible for office on account of their failure to pay back the mileage stipend each had received for traveling to Allentown in 2008.

In bringing this suit, Plaintiffs plead two distinct but related theories of liability.  On Count I (the LMRDA claim), they believe that the ATU's ineligibility decision was not simply the Union's applying a neutral eligibility rule fairly and evenhandedly, but rather represented a "customized disciplinary penalty" imposed on Plaintiffs.  <u>See</u> <u>Murray</u>, 2014 WL 11281392, at *10.   As to Count II, Plaintiffs maintain that the same decision – that they lacked "good standing" on account of their arrearage – was substantively erroneous under the terms of the ATU constitution.  <u>Id.</u> at *12.  As the Court previously concluded in its first summary-judgment Opinion, both counts require resolution of one central question: did Plaintiffs take all actions that the Union could reasonably have expected them to in attempting to repay their debts?  Or, viewed from a different angle, did the Union "thwart" Plaintiffs' efforts at repayment?

In its current Motion, Defendant views this question almost exclusively through the lens of Count I, even though it asks the Court to dismiss the suit "in its entirety."  Mot. at 33.  As a result, even though this Court has already twice delved into the intricacies of the LMRDA, a third trip is warranted given the centrality of the statute to the present dispute.  The Court will

thus provide a primer on LMRDA § 101(a)(5), explain its previous resolution of the "discipline"

issue, and then apply that law to the fully developed record before it.  As before, the Court

concludes that Plaintiffs have raised a triable issue of fact that cannot be resolved at the

summary-judgment stage.

### 1.  *Discipline under § 101(a)(5)*

As this Court previously recounted, the LMRDA "has two principal components."

Murray, 2014 WL 11281392, at *6.  The one relevant here is Title I – "Bill of Rights of

Members of Labor Organizations" – which "registers Congress's concern with the rights of

individual union members."  Id.  Its provisions provide numerous guarantees to such members,

including "freedom of speech and assembly, freedom to vote in union elections, and freedom

from improper disciplinary action."  Id.  While Title I is inapplicable to local unions like Local

1300 that are "composed purely of government employees," id., its provisions may be invoked to

"protect members of such locals in their dealings with a parent union that," like the ATU, "is

subject to the LMRDA."  Id. (emphasis added).

Title I includes § 101(a)(5), which is captioned "Safeguards against improper disciplinary

action."  That subsection provides that a member may not be disciplined without being given – in

advance of such discipline – notice, a chance to prepare a defense, and a hearing:

> No member of any labor organization may be fined, suspended,
> expelled, or otherwise disciplined except for nonpayment of dues by
> such organization or by any officer thereof unless such member has
> been (A) served with written specific charges; (B) given a
> reasonable time to prepare his defense; (C) afforded a full and fair
> hearing.

29 U.S.C. § 411(a)(5) (emphasis added).  The parties agree that Plaintiffs were not fined,

suspended, or expelled, nor were they afforded any of the procedural safeguards listed in (A)

through (C), meaning that the only question is whether Defendant "otherwise disciplined" them

by invalidating the election.  See Murray, 2014 WL 11281392, at *9-10.

2. *First Summary-Judgment Opinion*

In its earlier Opinion, the Court first rejected several of the ATU's arguments that § 101(a)(5) was inapplicable and then proceeded to the question of "discipline."  Looking to Supreme Court precedent, it observed that "'discipline' – as used in the LMRDA – refers to 'the criminal law of union government'" and "signifies the imposition of 'punishment' on an individual by a union acting in its official capacity in order to enforce its rules."  Id. at *10 (quoting Breininger v. Sheet Metal Workers Int'l Ass'n, 493 U.S. 67, 91 (1989), and citing id. at 92 n.15).  In contrast, a "'uniform application' of reasonable classification criteria" that is "'fairly' and 'even-handed[ly]' applied" lacks the punitive dimension necessary to trigger the procedural protections of § 101(a)(5).  See Murray, 2014 WL 11281392, at *10 (quoting Macaulay v. Boston Typographical Union No. 13, 692 F.2d 201, 204 (1st Cir. 1982)); see also Galke v. Duffy, 645 F.2d 118, 120 (2d Cir. 1981) ("[U]nilateral union alterations of employee status are not 'discipline' where reasonable regulations are uniformly and fairly enforced . . . .").

Having thus teased out the "sensible distinction between 'singling out a union member (or a group of members) for punishment' and the 'uniform application' of reasonable classification criteria," Murray, 2014 WL 11281392, at *10 (quoting Macaulay, 692 F.2d at 204), the Court sought to determine whether Hanley's 2014 eligibility ruling fell into one camp or the other.  It agreed with Defendant that some elements of Hanley's February 2014 eligibility ruling supported the ATU's "characterization as an objective administrative determination rather than as discipline."  Id.  In particular, the Union "relied on neutral eligibility criteria set out in the ATU constitution; it imposed no collateral consequences on Plaintiffs other than suspension from and ineligibility to run for office; and [the decision] was handed down by an officer not assigned

disciplinary responsibilities." Id.

The Court also had no trouble concluding that Hanley reasonably determined that Plaintiffs actually owed Local 1300 the mileage stipends – particularly given the lengthy train of correspondence among McClure, George, and Murray that specifically and clearly concluded that it was both improper to receive such stipends and that Murray was responsible for paying hers back. Id. at *11. That determination, the Court concluded, was "correct as a matter of law." Id. at *13.

The difficult issue, however, concerned Hanley's conclusion that Plaintiffs' "subsequent failure to [repay the stipends] over the course of several years rendered them members not in good standing and, therefore, ineligible for office." Id. at *11. Plaintiffs vehemently insisted that the ATU had failed to give fair consideration to Murray's purported attempts at repayment. See id. (As noted previously, Queen hitches his wagon to Murray's star, since he relied on her representations about the Union's alleged thwarting of these attempts. See id.) Murray claimed that on numerous occasions she had tried to repay the Allentown sum, but that, for a variety of reasons, her efforts had been frustrated. Id. She also insisted that she had communicated these incidents to Hanley before he rendered his decision. Id. As to Count I, the Court concluded that if Plaintiffs' version of events were credited:

> A jury could find that Hanley acted in a wholly unjust manner by deeming Murray ineligible for office on the basis of financial arrearage despite his knowledge [assuming the jury credited him with such knowledge] that her attempts to make good were rebuffed at every turn.

Id. Turning to Count II, the Court concluded that, for nearly identical reasons, judgment was improper on the question of whether the ATU's decision was substantively reasonable under the terms of the ATU constitution:

> [I]f, as Plaintiffs contend, they repeatedly tried to repay the money
> they owed, yet the Local thwarted them in all manner of ways, a jury
> could conclude that it was unreasonable – or even, perhaps, an act
> of bad faith – for the ATU to find them ineligible for office based
> on the arrearage. Because the reasonableness of Hanley's
> ineligibility determination turns on genuine issues of fact, the Court
> is unable at this juncture to grant judgment to either party.

Id. at *13.

### 3.  *Application of § 101(a)(5) to Current Record*

With a more robust record, Defendant again moves for summary judgment.  The only issue is this: did the Local "thwart" Plaintiffs' attempt at repayment in such a way as to render President Hanley's good-standing decision an unfair, targeted application of a reasonable rule? See id. at *10 (no "discipline" where classification rule is "reasonable[]" and applied to union members "fairly" and "even-handed[ly]") (internal citations and quotation marks omitted).  Or is the record sufficiently clear that the ATU should not be faulted for Plaintiffs' failure to repay the stipends?  Finding that the newly adduced evidence adds little to the record beyond what was available during its first summary-judgment decision, the Court will again deny Defendant's Motion.  Before addressing the merits, the Court will dispense with two procedural issues – one raised by Plaintiffs, the other by Defendant.

### *i.*  Procedural Challenges

Plaintiffs argue that Defendant's Motion here is, in effect, a motion for reconsideration of the Court's December 2014 decision and should be denied because motions seeking reconsideration of "interlocutory" rulings are granted "only in 'extraordinary circumstances.'" Opp. at 12 (quoting this Court's Opinion in Murray, 99 F. Supp. 3d at 153).  This is already something of a moot point, since the Court has presaged that it will deny the Motion.  In any event, this is not a reconsideration motion in the strict sense of asking the Court to revisit its first decision based upon the law and the facts as they stood then.  See Brownfield v. Landon, 307

15

F.2d 389, 393 (D.C. Cir. 1962) (second motion for summary judgment was not "an identical

motion" to first one where second motion considered "a different and expanded record").  On the

contrary, since discovery has resulted in a record that is different from and more expansive than

the one previously before the Court, a renewed motion is entirely proper here.  See, e.g.,

Williamsburg Wax Museum, Inc. v. Historic Figures, Inc., 810 F.2d 243, 251 (D.C. Cir. 1987)

("A subsequent motion for summary judgment based on an expanded record is always

permissible.") (citation omitted); Hoffman v. Tonnemacher, 593 F.3d 908, 911 (9th Cir. 2010)

(same).

     The next procedural objection is lobbed into play by Defendant, which argues that

Plaintiffs' failure to expressly abide by one of the District Court's Local Rules – 7(h) – means

that the Court should ignore Plaintiffs' statement of facts and treat its own statement of facts as

admitted.  See Reply at 1.  Local Rule 7(h)(1) provides that "[e]ach motion for summary

judgment shall be accompanied by a statement of material facts as to which the moving party

contends there is no genuine issue," and it requires that any opposition to such a motion "be

accompanied by a separate concise statement of genuine issues setting forth all material facts as

to which it is contended there exists a genuine issue necessary to be litigated . . . ."  Applicable to

both sides is a requirement that the statement "include references to the parts of the record relied

on to support [it]."  LCvR 7(h)(1).  In deciding a motion for summary judgment, a court "may"

penalize an opposing party's failure to "controvert[]" a given fact by "assum[ing] that facts

identified by the moving party in its statement of material facts are admitted."  Id.

     Defendant argues that even though Plaintiffs did include a Rule 7(h) statement with their

Opposition, the filing did not expressly controvert Defendant's assertions in its own statement of

facts, meaning that the Court should deem Plaintiffs to have admitted Defendant's version of

events.  See Reply at 4.  They are correct that Plaintiffs' submission does not look like a typical

Rule 7(h) statement.  The generally observed practice is for the moving party to file its statement

of facts, and the opposing party to respond to that statement by indicating whether it "admits" or

"denies" each fact presented.  Where it denies a fact, it should include an explanation with

citations to the record.  At the end of its response, the opposing party may then provide its own

statement of facts, again with record citations, to the extent it believes such facts are necessary to

its argument.  Finally, the moving party may itself respond to those facts in a statement attached

to its reply.

   That procedure was not followed here because Plaintiffs did not expressly state that they

"admitted" or "denied" any given fact asserted by the ATU.  But such clarity, while preferable,

was unnecessary in this case, since Plaintiffs' statement made reasonably clear which facts they

contested and which ones they did not.  The procedure contemplated by Rule 7(h)(1) does serve

an important function by helping to "crystallize for the district court the material facts and

relevant portions of the record," instead of forcing the Court to waste efforts "sift[ing] and

sort[ing] through the record" itself.  Jackson v. Finnegan, Henderson, Farabow, Garrett &

Dunner, 101 F.3d 145, 151, 153 (D.C. Cir. 1996) (interpreting predecessor rule to LCvR

7(h)(1)).  Where Plaintiffs have submitted a statement of facts with record citations, however, the

purposes underlying the Rule have been satisfied, and the Court believes they have sufficiently

complied.  To hold otherwise would yield the draconian sanction of an adverse judgment, which

is not warranted in these circumstances.  See Robinson v. Dist. of Columbia, 130 F. Supp. 3d

180, 186-87 (D.D.C. 2015) (denying defendants' request that court deem as admitted their own

Rule 7(h) statement where such "sanction[] would be particularly draconian here," as

defendants' "statement of facts would, if conceded by Plaintiff, almost assuredly require

judgment as a matter of law against her").

*ii.* Substantive Defenses

Moving to the merits, the Court will now address Defendant's three arguments – raised for the first time in this round – for why Plaintiffs were not "disciplined" under the LMRDA as a matter of law.  It will start with Murray.  The ATU's central argument is that because three years elapsed between her last purported attempt at repayment in 2010 and the election challenge in 2013, and because the Union did nothing during that period to block repayment, it must be the case that any blame lies with her and not with the Union.  See Mot. at 12-13.  While the Court recognizes that a jury may well be swayed by this argument – particularly since the record offers ample bases to infer that Murray and Lovelace, the person who purportedly thwarted her efforts at repayment, were simpatico – a jury might just as readily go the other way.

Central to this conclusion is Murray's testimony in which she avers not only that Lovelace stood in her way of repaying the money back in 2009 and 2010, but also that she informed McClure of such behavior and he did nothing about it.  In her deposition, Murray was asked whether she could "recall any other conversations that you either had or you heard that Mr. McClure was a participant in on the topic of mileage advances and/or repayments?"  Murray Depo. Day 1 at 160:7-11.  Murray responded that some time "between November and June of 2010,"

> I had a couple of times talked with Mr. McClure about it because I asked him to tell me how much [the Allentown trip] was so that I could repay it because he was running around showing all these letters to the Members trying to infer that I was – that I had taken money from the Union and I didn't.
>
> So, I told him to just tell me how much it is, I'll pay it because I didn't want to keep revisiting this issue.  And he would not tell me the amount.  He would either walk away or tell me to go get it from Lovelace.
>
> And when I told him Lovelace wouldn't tell me, he would just give that crazy smile of his and walk away.  And that would be

it. . . . [T]hat happened several times.

Id. at 160:12-161:18.  According to Plaintiffs, Murray could have reasonably concluded from these interactions that McClure had "effectively ratified Lovelace's conduct [while he] was still President," Opp. at 15, thereby relieving her and Queen of any obligation to return to Lovelace again, or to try to make payment once Lovelace was voted out of office in the summer of 2010.

Defendant barely addresses this testimony, burying a paltry, single-sentence rejoinder in a footnote: "Any suggestion that McClure 'ratified' Lovelace's position . . . is nonsensical given McClure's public stance to the contrary."  Reply at 6 n.1.  In other words, because McClure made clear in various forums that he wanted the moneys returned, it is unreasonable to conclude from this conversation that he in any way condoned Lovelace's response.  This position ignores the obvious: someone may convey one thing in public and the opposite in private – which is just what Murray has testified to in her deposition.

The ATU's second argument is merely a variation on this theme, and thus it meets the same fate.  It contends that because Lovelace was voted out of office in 2010, any conversation she had with him before that time in which he refused repayment "had no effect on her ability to make repayment at any time after June 2010, when Lovelace no longer held any union office."  Mot. at 13 (emphasis added).  Defendant's observation here is likely correct insofar as Lovelace's successor, Bertrand DeLoatch, promptly responded to Queen's February 2014 request for documentation regarding the Allentown trip, see PSOF, ¶ 28, and the Local cashed Murray's $200 check consisting of an estimate of the Allentown trip and quickly issued a refund check for $24.50.  See PSOF, ¶ 32.  Even if Defendant is right on this front, though, it does not necessarily negate the conclusion that, following her course of conduct in 2009 and 2010 with both Lovelace and McClure, Murray had done all that was reasonably necessary to attempt

repayment, and she was under no obligation to "try again" when a new Treasurer had been installed in the summer of 2010.  This argument is especially persuasive given that McClure remained as President.

Defendant's last attack is directed at Queen.  It argues that because he admittedly never attempted to repay the stipend, he cannot claim that he was "thwarted" in any such effort.  See Mot. at 11-12.  This argument is a non-starter.  The Court already concluded in its first summary-judgment Opinion that "although Queen does not himself claim to have undertaken repayment, a jury could infer that – given his awareness of Murray's efforts – he sensibly assumed that any further attempts would likewise be futile." Murray, 2014 WL 11281392, at *11.  Defendant does not marshal any new evidence obtained during discovery to show that the Court's prior resolution of this issue was misguided or should be revisited.  For instance, it does not identify any facts tending to show that Queen acted unreasonably in relying on Murray's representations, or that other events put him on notice that Murray's account of her repayment efforts should not be trusted.  While the Court is puzzled at Queen's continued insistence that he does not owe the Local anything at all, see DSOF, ¶ 29, that does not conclusively show that his reliance on Murray's narrative was unwarranted.

This result should not be taken to discount the persuasive evidence on Defendant's side of the scale.  A jury may well conclude that Murray's account of McClure's counterintuitive thwarting of her repayment is simply not credible.  It may also decide that because Murray and Lovelace both acknowledged that members had a right to inspect their own financial records – including expense reports, see PSOF, ¶ 38 – she knew or should have known she could bypass Lovelace and figure out what she owed for the Allentown trip without his help.  Finally, Murray's explanations – e.g., on why she declined to pay the money back after Lovelace left or

could easily estimate the cost of the trip as soon as her eligibility was challenged – may or may not be credited over Defendant's testimony.  At the end of the day, these will all be collapsed into the ultimate issue – was she in fact thwarted? – which will be appropriately resolved by the factfinder at trial.

    B.  <u>Damages</u>

Defendant next moves to either eliminate or substantially trim back Plaintiffs' potential monetary award by challenging the availability of damages under the LMRDA.  By focusing its arguments exclusively on the damages claimed under that count, it neglects to consider that Plaintiffs may obtain the same set of damages under Count II (the LMRA breach-of-contract claim).  As a result, any decision nullifying LMRDA damages here would not eliminate or simplify what damages may be sought at trial.  The one exception, however, is punitive damages. The Court will first address why summary judgment is inappropriate for compensatory damages and will then resolve why it does knock out punitive damages.

    1.  *Compensatory Damages*

Defendant directs the bulk of its briefing to arguing that compensatory damages are not available <u>under the LMRDA</u> given the facts presented here.  Even assuming the ATU is correct, it faces one insuperable problem, which is that it wholly ignores that Plaintiffs also seek such damages under Count II.  Any ratification of the Union's position on this point, therefore, would have no effect on trimming back the damages issue that must be addressed at trial if Plaintiffs succeed on liability.

An explanation of this point starts with the Amended Complaint, in which Plaintiffs separately listed their damages request under each count.  As to the LMRDA violation (Count I), they sought a judgment that, *inter alia*, "[a]wards plaintiffs compensatory damages for, among

other things, lost past and future wages and benefits, pain and suffering, and injury to reputation." Am. Compl, ¶ 38(b).  As to the breach-of-contract claim under § 301 of the LMRA (Count II), they similarly asked for a judgment "[a]ward[ing] plaintiffs compensatory damages for, among other things, lost past and future wages and benefits." Id., ¶ 42(b).  Although the latter request does not explicitly list the same types of damages set out in the former, Plaintiffs have covered their bases by indicating that Count II's prayer for relief includes but is not limited to "lost past and future wages and benefits." Id.  Plaintiffs may thus credibly argue that they should be permitted to seek the full panoply of compensatory damages under both counts.

Although Defendant might have eliminated any such ambiguity during discovery, it never pinned specific forms of damages to a given theory of liability.  On the contrary, its interrogatories broadly asked each Plaintiff to "identify all damages, whether compensatory, punitive, or of any other kind, you claim in this suit, describe the factual basis for each form of damage you claim, and explain your calculations of those damages."  Mot., Exh. 32 (Murray's Second Supplemental Answers to ATU's Interrogatories), ¶ 23 (emphasis added); id., Exh. 18 (Queen's Supplemental Answers to ATU's Interrogatories), ¶ 22.  Plaintiffs responded in kind, addressing what forms of compensatory relief they thought were appropriate in the suit as whole – i.e., pain and suffering, emotional distress, medical injury, lost wages and benefits, and reputational harm – without linking each form of damages to one count or the other.

This unified treatment of damages would not necessarily have presented an insurmountable problem had Defendant moved to eliminate some or all forms of damages across the board.  Such a motion would be entirely proper under Rule 56(a), even though the Rule expressly permits parties to move for judgment as to each "claim or defense," and does not explicitly contemplate a party's challenging its opponent's right to a specific remedy.  See, e.g.,

Strike It Rich, Inc. v. Joseph Schlitz Brewing Co., 505 F. Supp. 89, 91 (D.D.C. 1980) (denying

trademark defendant summary judgment of no liability but granting judgment that no damages

were warranted where "plaintiff repeatedly has failed to provide either this Court or defendant

with any proof of damage that could be tested or studied"); Fed. Agr. Mortgage Corp. v. It's A

Jungle Out There, Inc., No. 03-3721, 2005 WL 3325051, at *12 (N.D. Cal. Dec. 7, 2005) (same);

see also Loft v. Stationary Engineers, Local 39 PTF, LLC, 87 F. Supp. 3d 1138, 1146-47 (N.D.

Cal. 2015) (citing cases).

 The problem for Defendant here, however, is that all of the arguments it marshals against

Plaintiffs' damages claims are tied to the LMRDA.  Its broadest argument – that the LMRDA

does not contemplate damages at all under the particular facts present here – says nothing about

whether damages would be appropriate under § 301(a) of the LMRA.  See Mot. at 33-36.

Similarly, Defendant bases its argument against reputational damages on the ground that they

should not be available as a matter of law "in the LMRDA context."  Id. at 41.  When targeting

Plaintiffs' claim for "medical and emotional injury" damages, furthermore, Defendant leads off

by stating that "Plaintiffs also seek damages under the LMRDA to compensate for medical

injury, pain and suffering, and emotional distress," arguing that "undisputed facts foreclose all

these claimed damages as a matter of law."  Id. at 42-43 (emphasis added).  And finally, in the

context of lost wages, Defendant makes clear in its Reply that it was focused on damages

available under the LMRDA without ever mentioning the LMRA.  See Reply at 22 ("[E]ven if

ATU's ineligibility ruling somehow violated LMRDA § 101(a)(5), that alone could not support a

claim for constructive discharge," which it argues is necessary to support Queen's claim for lost

wages.).

Because Defendant's briefing was limited to damages available under Count I, it did not provide Plaintiffs with adequate notice that some or all of their compensatory-damages claim under Count II might also be at risk. "*Sua sponte* summary judgments are justified only after 'the party against whom the judgment will be entered was given sufficient advance notice and an adequate opportunity to demonstrate why summary judgment should not be granted.'" Stewart v. Credit Bureau, Inc., 734 F.2d 47, 53 n.10 (D.C. Cir. 1984) (quoting 10A, C. Wright, A. Miller, M. Kane, Fed. Prac. & Procedure § 2720 at 87); see Athridge v. Rivas, 141 F.3d 357, 362 (D.C. Cir. 1998) (improper to grant summary judgment for all defendants where motion by one set of defendants "did not adequately place the plaintiffs on notice that summary judgment might be granted *sua sponte*" to other defendants). Plaintiffs' claim for damages under the LMRA, therefore, must be permitted to proceed.

This result, of course, does not necessarily require the Court to abstain on the question of damages under Count I. But because the full set of damages remains available under Count II, the Court finds that the more sensible – and judicially economical – approach is to shelve the issue until its resolution is, in fact, required. See AFTG-TG, LLC v. Nuvoton Tech. Corp., 689 F.3d 1358, 1364 (Fed. Cir. 2012) (It is a "cardinal rule that a court should not decide a legal issue when doing so is unnecessary to resolve the case at hand."). Such resolution may become necessary in the unlikely event that a jury resolves the liability question in favor of Plaintiffs on Count I but not on Count II. Equally likely, however, is that a jury finds no liability on either count, or finds liability on both; either outcome would render present resolution of the Count I damages issue entirely superfluous. At bottom, because the full set of compensatory damages remains available under Count II, there is no prejudice to Defendant in deferring resolution of these issues.

2. *Punitive Damages*

Unlike compensatory damages, which are requested under both counts, Plaintiffs clearly seek punitive damages exclusively in connection with Count I, and thus the Court may properly resolve the question.  Compare Am. Compl., ¶ 38(b), (c) (Count I prayer seeking both punitive and compensatory damages) with id., ¶ 42(b) (Count II prayer seeking only compensatory damages).  Plaintiffs acknowledge that they face a steep climb.  Courts have long recognized that "general labor policy disfavors punishment," Int'l Bhd. of Elec. Workers v. Foust, 442 U.S. 42, 52 (1979), particularly because punitive damages may be substantial, causing an adverse impact on myriad union members who are wholly innocent of any violations.  See Quinn v. DiGiulian, 739 F.2d 637, 650 (D.C. Cir. 1984) ("[T]he collective interests of the union membership, most of which is ordinarily innocent of wrongdoing, could be directly and severely harmed by the financial impact of a punitive damages award.").

Because large punitive awards "would do little to further the congressional goal of fostering the development of vigorous and democratic labor organizations that are responsive to the needs of their members," id. at 651, this Circuit has set a high bar for Plaintiffs seeking such damages under the LMRDA.  Punitive awards may be "imposed only in the most egregious cases, in which the conduct of the union or its officers was malicious – motivated by ill will or a purpose to harm the plaintiff's interests."  Id.

Plaintiffs insist that "Hanley's ineligibility decision was so motivated," Opp. at 24, and they jointly demand $1.5 million as punishment.  See PSOF, ¶¶ 64, 115.  The evidence they offer in support of such a dramatic assertion, however, is practically nonexistent.  Instead of pointing to any actions taken by Hanley tending to show malice or ill will, they rest their case on their belief that the ATU bungled the investigation and mishandled the ultimate decision to invalidate

25

the 2013 election results.  In their statement of facts, they argue vociferously that Hanley was, for the most part, not involved in the investigation, which "was delegated to the ATU's legal department."  PSOF, ¶ 48.  As a result, Plaintiffs' assertions – that the ATU "disregarded evidence that Plaintiffs made repayment efforts," failed to speak to Queen directly, and "did not even speak with Lovelace" to see if he would corroborate Murray's claims – pertain to whether the ATU's <u>legal team</u> did a good job in deciding whether to invalidate Local 1300's election results.  Viewing these facts in the light most favorable to Plaintiffs, at worst they show that the ATU conducted its investigation carelessly.  That is a far cry from showing that <u>Hanley</u> acted with malice in invalidating the election.

The only assertion pertaining to Hanley's participation in the investigation is that he purportedly "dismissed as 'preposterous' the 'idea' that both Lovelace and McClure had both refused to provide Murray with the amount of the Mileage Stipend amount [*sic*], even though Murray had told him that this had occurred."  Opp. at 25 (citing PSOF, ¶ 48).  Although Plaintiffs do not identify where they plucked these quotations from in the sprawling record, and even though the Court was not obliged to go hunting on its own accord, <u>see</u> Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . ."), it nevertheless located them in a portion of Hanley's deposition transcript.  <u>See</u> Hanley Depo. at 53:1-22.  When viewing the colloquy in full, it becomes clear that Hanley did admit to making a credibility determination about Murray, concluding that it was "ridiculous" to think that McClure – "the person, the President, who has been saying please pay this debt" – would obstruct her attempt to pay back the stipend.  <u>Id.</u> at 53:5-8.  The transcript, however, does not indicate whether his impression was communicated to the ATU's legal team or had any impact on the ineligibility decision whatsoever, and Plaintiffs point to no evidence suggesting that it did.  These excerpted

statements, therefore, provide no evidence of malice or ill will towards Plaintiffs, and they certainly do not render this case an "egregious" one.  See Quinn, 739 F.2d at 651.

Plaintiffs also insist that the manner in which Hanley communicated the election-invalidation decision demonstrates malice.  See Opp. at 25.  In particular, they object to the fact that he informed both the membership of Local 1300 and a reporter with The Baltimore Sun that Plaintiffs were "justifiably removed from office" for retaining money that belonged to the Local. Id.  Plaintiffs do not go so far to say that such statements were categorically false – at most, they suggest that it was misleading for Hanley to make such statements "despite evidence that Local 1300 had thwarted efforts by Plaintiffs to repay those monies."  Opp. at 25-26.  Even if, upon further fact finding, it turns out that the ATU was not justified in removing Plaintiffs from office – or, at least, should have given them notice and a hearing before doing so – these communications cannot support an inference that Hanley was "motivated by ill will or a purpose to harm the plaintiff[s'] interests."  Quinn, 739 F.2d at 650.

Plaintiffs offer one last disconnected factoid to support their quest for punitive damages: that "McClure supported Hanley in the latter's successful campaign to win election to ATU's presidency in 2010."  Opp. at 26 (citing PSOF, ¶ 1).  This fact, whether considered alone or in combination with the other "evidence" Plaintiffs marshals to support their case, provides nothing more than a speculative basis for inferring some form of bad-faith conduct on the part of Defendant.  It cannot salvage Plaintiffs' punitive-damages request.

## IV.    Conclusion

For these reasons, the Court will grant Defendant's Motion as to punitive damages but deny it in all other respects.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:   April 26, 2016