## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JANICE MURRAY, *et al.*,

     Plaintiffs,

     v.

AMALGAMATED TRANSIT UNION,

     Defendant.

Civil Action No.  14-378 (JEB)

## MEMORANDUM OPINION

"Courts do not usually raise claims or arguments on their own.  But federal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press."  Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428, 434 (2011).  And so, despite all of the ink spilled to date in multiple prior Opinions, the Court now finds itself questioning its subject-matter jurisdiction in this long-running labor dispute.

The nub of the case concerns a contested union-officer election held by Local 1300 of the Amalgamated Transit Union in June 2013.  Plaintiffs Janice Murray and Tim (Alnett) Queen ran for President and Vice President respectively and won the election.  The disappointed runner up for presidency, incumbent David McClure, challenged these results.  He argued that Murray and Queen were not "in good standing" with the Union – a requirement under the ATU Constitution to be eligible for office – because they both owed outstanding debts to the Union. The ATU ultimately agreed that such debts rendered them ineligible for office and thus invalidated the election, causing the Local to hold a re-run election, which McClure won.  Plaintiffs then sued the ATU for violating the Labor Management Reporting and Disclosure Act of 1959 (LMRDA)

and for breaching their contract rights under the ATU Constitution.  They requested a range of remedies that included reinstatement as duly elected officers, a declaration of invalidity regarding the ATU's decision and the subsequent rerun election, and damages for wages lost, emotional distress, and reputational harm.

The suit has now proceeded through a motion for a temporary restraining order, a motion for a preliminary injunction, two periods of discovery, two summary-judgment motions, and one reconsideration motion.  On resolving the most recent round, the Court observed potential jurisdictional defects in the suit – an issue that might well have saved considerable time and money had it been raised at the outset.  As "[f]ederal courts are courts of limited subject-matter jurisdiction," this Court must assure itself through all stages of the litigation that it has such jurisdiction "even if the parties . . . are willing to assume it."  Al-Zahrani v. Rodriguez, 669 F.3d 315, 317 (D.C. Cir. 2012).  The Court raised the jurisdictional question with the parties and permitted Defendant to file a Motion to Dismiss, which is now ripe.  Concluding that Congress has not given federal courts jurisdiction over a dispute such as this one, the Court will grant Defendant's Motion and dismiss the case.

## I.      Background

The particulars of this dispute are not tremendously important in resolving the jurisdictional question posed here.  A few key facts will do the trick, and the reader may refer to the Court's second summary-judgment decision for a more thorough treatment of the case's factual and procedural backdrop.  See Murray v. Amalgamated Transit Union (Murray III), No. 14-378, 2016 WL 1664775 (D.D.C. Apr. 26, 2016).

The dispute centers on Local 1300's triennial election of officers (and, at least for some positions, ex officio delegates to the national ATU Convention) in which Murray and Queen ran

together for President and Vice President and won the vote.  Murray III, 2016 WL 1664775, at

*1, 4.  David McClure, Local 1300's President from 2007 to 2013, also ran for President but

came in second.  Id. at *1-2.  Dissatisfied with the outcome, and believing that neither Murray

nor Queen was eligible to run for office, McClure challenged the election, going first to the

Local.  He argued that because both Plaintiffs had failed to pay an outstanding debt to the Union

of $175.50 (for travel reimbursements that they should not have received), they were not

members "in good standing" and thus could not properly run for office under rules established by

the ATU Constitution.  See id. at *4; ATU Const., § 14.2 (good-standing requirement); id.,

§ 21.9 (specifying that member is no longer in "good standing" when she fails to pay dues or any

other "monies owed the Union" and the arrearage continues for a period of time).

Local 1300 denied McClure's challenge.  Murray III, 2016 WL 1664775, at *4.  He then

appealed to the ATU, filing a letter with its President, Larry Hanley, in August 2013.  Id.  After

conducting an investigation, Hanley issued a decision in February 2014 concluding that Murray

and Queen both failed the "good standing" requirement and thus had been, at the time of the June

2013 election, ineligible to run for office.  Id.  That conclusion invalidated the June 2013 election

results, stripped Plaintiffs of their offices, and necessitated that the Local hold a re-run election

in early 2014, which McClure won.  Id.  Hanley took no other allegedly "disciplinary" action

against them.

Plaintiffs filed suit here shortly thereafter in March 2014 against both the ATU and Local

1300.  The Court denied their motion for a temporary restraining order – in which they primarily

sought to invalidate the rerun election – on March 18, 2014.  See Murray v. Amalgamated

Transit Union (Murray I), No. 14-378, 2014 WL 11281392, at *5 (D.D.C. Dec. 19, 2014) (first

summary-judgment Opinion).  Plaintiffs then filed an Amended Complaint that included only

two counts asserted against the ATU.

Count I alleges a violation of Title I of the LMRDA.  Section 101(a)(5) of that statute, 29

U.S.C. § 411(a)(5), prohibits "labor organization[s]" from "fin[ing], suspend[ing], expel[ling], or

otherwise disciplin[ing]" its members, "except for nonpayment of dues," without providing

notice and a hearing.  Plaintiffs contend that Hanley's February 2014 decision constitutes

"discipline[ against] Murray and Queen by deeming them to be . . . members not in good

standing and ineligible to run for Local officer positions."  Am. Compl., ¶ 37.  In Count II,

Plaintiffs claim that Defendant breached its contractual duties under the ATU Constitution by

improperly deeming them ineligible for office, thereby stating a claim under either state contract

law or § 301 of the Labor Management Relations Act of 1947.  While both counts were thus pled

under distinct sources of law, each was tethered to the question of whether the ATU had

improperly vacated the election results on account of Plaintiffs' outstanding debts and wrongly

deemed Plaintiffs ineligible to participate in the rerun election.

Defendant declined to file a motion to dismiss, and in summer 2014 the parties filed

early-stage cross-motions for summary judgment, focusing on the merits of the dispute and

Plaintiffs' eligibility for office.  The Court denied both cross-motions in December 2014.  See

Murray I, 2014 WL 11281392, at *9-13.  Plaintiffs then filed a motion for reconsideration, which

the Court denied in April 2014.  See Murray v. Amalgamated Transit Union (Murray II), 99 F.

Supp. 3d 149, 158 (D.D.C. 2015).  After discovery, Defendant filed a second motion for

summary judgment targeted at both liability and damages.  The Court granted in part and denied

in part that motion in April 2016, eliminating Plaintiff's request for punitive damages but

otherwise concluding that genuine issues of fact precluded the award of summary judgment in Defendant's favor.  See Murray III, 2016 WL 1664775, at *6-14.

During consideration of this last motion, however, the Court developed a concern about its authority to hear the case.  It issued an Order on May 2, 2016, in which it asked the parties whether section 403 of LMRDA's Title IV – which provides as the "exclusive" "remedy . . . for challenging an election already conducted" a complaint to the Secretary of Labor, see 29 U.S.C. § 483 – stripped the Court of subject-matter jurisdiction over Plaintiff's suit.  See ECF No. 64 (Order of May 2, 2016).  After holding a hearing on May 12, 2016, the Court gave Defendant leave to file a motion to dismiss for lack of subject-matter jurisdiction.  See Minute Order of May 12, 2016.  That briefing is now complete.

## II.    Legal Standard

Federal courts possess only limited subject-matter jurisdiction, and "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction."  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  Fed. R. Civ. P. 12(h)(3).  Where, as here, the Court is "faced with what a party characterizes as a Rule 12(h)(3) motion, [it] should treat the motion as a traditional Rule 12(b)(1) motion for lack of subject matter jurisdiction."  Harbury v. Hayden, 444 F. Supp. 2d 19, 26 (D.D.C. 2006) (citing Haase v. Sessions, 835 F.2d 902, 905-06 (D.C. Cir. 1987)).  In so doing, the Court "is not limited to the allegations of the complaint," Hohri v. United States, 782 F.2d 227, 241 (D.C. Cir. 1986), vacated on other grounds, 482 U.S. 64 (1987), but "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction."  Jerome Stevens Pharm., Inc. v. FDA, 402 F.3d 1249, 1253

(D.C. Cir. 2005).  "[P]laintiffs are not limited to evidence that meets the standards of admissibility required by the district court.  Rather, they may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." Mwani v. bin Laden, 417 F.3d 1, 7 (D.C. Cir. 2005).

## III.   Analysis

Defendant's jurisdictional challenge is premised on a concept peculiar to the labor-relations world known as "Title IV preemption."  See Casumpang v. Int'l Longshoremen's & Warehousemen's Union, Local 142, 269 F.3d 1042, 1057 (9th Cir. 2001).  The Court will first provide a digest of this form of preemption and then apply it to the challenge at issue.

### A.   Title IV Preemption

The LMRDA "was Congress's first major attempt to regulate the internal affairs of labor unions."  Local No. 82, Furniture & Piano Moving v. Crowley, 467 U.S. 526, 528 (1984); see 29 U.S.C. § 401(c) (statement of congressional purpose noting that LMRDA was enacted in part "to eliminate or prevent improper practices on the part of labor organizations").  It is a "complex statutory scheme" consisting of seven titles, see Crowley, 467 U.S. at 529, and two of them – Titles I and IV – play leading roles here.

Title I, codified at 29 U.S.C. §§ 411-15, provides a "Bill of Rights" for union members, which is "designed to guarantee every union member equal rights to vote and otherwise participate in union decisions, freedom from unreasonable restrictions on speech and assembly, and protection from improper discipline."  Crowley, 467 U.S. at 536-37; see 29 U.S.C. § 411; Molina v. Union de Trabajadores de Muelles y Ramas Anexas, Local 1740, 762 F.2d 166, 168 (1st Cir. 1985) ("The typical Title I claim involves an allegation of unequal treatment among union members.") (citing Calhoon v. Harvey, 379 U.S. 134 (1964)).  Title IV, in contrast,

codified at §§ 481-83, "regulates the conduct of elections for union officers, and therefore

protects many of the same rights as does Title I." Crowley, 467 U.S. at 539. It gives "every

member [of a union] in good standing" the right to "be eligible to be a candidate and to hold

office (subject to . . . reasonable qualifications uniformly imposed) . . . without being subject to

penalty, discipline, or improper interference or reprisal of any kind by such organization or any

member thereof." 29 U.S.C. § 481(e).

Each Title, significantly, also provides a distinct mechanism for enforcement. Title I

grants a federal cause of action to individual members, who may bring suit to vindicate their

Title I rights in federal district court. See id. § 412. Title IV, in turn, "provides an elaborate

postelection procedure aimed solely at protecting union democracy through free and democratic

elections, with primary responsibility for enforcement lodged with the Secretary of Labor."

Crowley, 467 U.S. at 528. The remedy contemplated by Title IV involves a union member's

filing a complaint with the Secretary, who may then sue the union directly in district court if it

decides that the complaint warrants its intervention. See 29 U.S.C. § 482(a)-(c). Importantly,

Congress in Title IV also included "an exclusivity provision," which explains when and under

what circumstances a Title IV remedy will preempt a plaintiff's ability to seek overlapping relief

under other state laws (like torts or contracts) or other federal laws (like Title I of the LMRDA).

See Crowley, 467 U.S. at 540. That provision provides in relevant part:

> Existing rights and remedies to enforce the constitution and bylaws
> of a labor organization with respect to elections prior to the conduct
> thereof shall not be affected by the provisions of this subchapter.
> The remedy provided by this subchapter for challenging an election
> already conducted shall be exclusive.

29 U.S.C. § 483 (emphases added).

In interpreting this provision, the Supreme Court concluded that Congress intended a

"suit by the Secretary [to be] the 'exclusive' post-election remedy for a violation of Title IV."

Trbovich v. United Mine Workers of Am., 404 U.S. 528, 531 (1972) (emphasis added) (quoting

§ 483); see Crowley, 467 U.S. at 541 ("[T]he exclusivity provision included in [§ 483] of Title

IV plainly bars Title I relief when an individual union member challenges the validity of an

election that has already been completed.").  Reading that provision alongside Title I's limitation

that district courts may only award "appropriate" relief, 29 U.S.C. § 412, the Court also

concluded that Congress "would not have considered a court order requiring and judicially

supervising a new election to be 'appropriate' relief under Title I," meaning courts lack

jurisdiction over such claims.  Crowley, 467 U.S. at 543, 546.

Crowley also suggests, however, that Title IV need not always divest courts of

jurisdiction to hear election-related challenges, and it identified a possible exception to that

general rule, albeit phrased in hypothetical rather than concrete terms.  Specifically, it noted that

§ 483 might allow courts to entertain Title I or other federal- or state-law claims that are merely

tangential to an already-completed election.  As a result, the Court's conclusion that "§ [483] of

Title IV plainly bars Title I relief when an individual union member challenges the validity of an

election that has already been completed"

> . . . does not necessarily mean that § [483] forecloses the availability
> of all postelection relief under Title I.  The exclusivity provision of
> Title IV may not bar postelection relief for Title I claims or other
> actions that do not directly challenge the validity of an election
> already conducted.  See, e.g., Ross v. International Brotherhood of
> Electrical Workers, 513 F.2d 840 (CA9 1975) (common-law tort
> claim); Amalgamated Clothing Workers Rank and File Committee
> v. Amalgamated Clothing Workers of America, Philadelphia, Joint
> Board, 473 F.2d 1303 (CA3 1973) (Title I claim).

Id. at 541 & n.16 (emphasis added).  The Court did not further elaborate on what it meant by

"Title I claims or other actions that do not directly challenge the validity of an election," id., but

8

it is possible to discern something from the two cases it cited in support of that concept.

The first one, <u>Ross</u>, clarifies that a cause of action arising in the course of a challenged election, and whose resolution does not require the court to touch on the validity of the election itself, is not preempted by Title IV.  The plaintiff in that case, Glynn Ross, brought a multi-count suit against both his local union and an individual named Raymond Duke, the local's incumbent president.  Ross, who had run for the position of financial secretary and business manager, asserted that the union had acted improperly in executing the election of its officers, which included certain tortious conduct carried out by Duke.  <u>See</u> 513 F.2d at 841-42 & n.2.  In the counts lodged against the local, Ross sought injunctive relief relating to the holding of a new election.  <u>Id.</u> at 841.  Those counts were mooted, however, by Ross's ultimate electoral victory.  <u>Id.</u>  The only live claim that remained, then, was his common-law tort claim against Duke, which the Court concluded was not preempted by Title IV.

In explaining its reasoning, the Court made clear that although Ross's damages claim arose from conduct that took place during a contested election, the election itself was no longer at issue.  Ross had already "won his election" and had not in any way "challenge[d] it or s[ought] any relief which would interfere with operation of the Local pursuant to the election" during which Duke's tortious conduct arose.  <u>Id.</u> at 842-43.  This was because the tort claim was asserted against Duke <u>alone</u>: "Only Duke [wa]s alleged to have engaged in tortious conduct and relief is sought only from him."  <u>Id.</u> at 843.  As a result, "[t]he Local would not in any way be affected by [a] judgment."  <u>Id.</u>  The court thus had no trouble concluding that Title IV's exclusive remedial scheme for post-election challenges did not come into play, meaning it had jurisdiction to entertain his claim.  <u>Id.</u> at 842-43.

The second case, <u>Amalgamated Clothing Workers</u>, similarly highlights that non-Title IV

claims relating to a contested election may not be preempted where the relief sought has no

bearing on the validity of the election itself.  In that case the plaintiffs brought a Title I claim,

asserting that certain eligibility rules set forth in a union's bylaws violated their free-speech and

assembly rights.  See 473 F.2d at 1307.  Importantly, although the suit pertained to election-

related rules, the Court made note that the plaintiffs had brought "essentially a preelection suit,"

as they "have applied for no judicial relief relative to the completed election.  They request only

that the union's bylaws be declared violative of the LMRDA."  Id. at 1305-06.  In other words,

Plaintiffs sought only a declaratory remedy that would have had <u>no effect</u> on the validity of an

already-completed election.  See id. at 1305-06.

 Both <u>Ross</u> and <u>Amalgamated Clothing Workers</u>, then, offer scenarios in which the claims

lodged by the plaintiffs − along with the specific relief sought − would have had at most a

negligible impact on a union election.  For that reason, Title IV did not deprive those courts of

subject-matter jurisdiction.  See <u>Molina</u>, 762 F.2d at 168 (noting that "neither [<u>Ross</u> nor

<u>Amalgamated Clothing Workers</u>] involve[d] changing the outcome of an election, either by

validation or invalidation").

 To summarize: Title IV, and specifically § 483, divests federal courts of subject-matter

jurisdiction to adjudicate claims brought after a completed union election that, in substance, seek

to challenge the election itself.  See <u>Calhoon</u>, 379 U.S. at 138 ("[J]urisdiction under [Title I, 29

U.S.C. § 412] can[not] be upheld by reliance in whole or in part on allegations which in

substance charge a breach of Title IV rights."); <u>Crowley</u>, 467 U.S. at 544 ("Congress clearly

intended to lodge exclusive responsibility for post-election suits challenging the validity of a

union election with the Secretary of Labor."); <u>see id.</u> at 541 n.16.

 With these broad preemption principles in mind, the Court now turns to the specific

claims raised by Plaintiffs and decides whether, as Defendants insist, it lacks subject-matter jurisdiction over the entire suit.  The Court also points out that Plaintiffs do not dispute Defendants' argument that if Count I is preempted, their claims under Count II must fall away as well.

Before diving in, though, the Court notes that it has received little help from Plaintiffs in this round of briefing.  At all other times, Plaintiffs' briefing has been thorough, containing thoughtful presentations of both fact and law.  Less so here.  The legal issue is undeniably complicated, and perhaps Plaintiffs can see the writing on the wall, but their brief here contains scant reference to or discussion of legal authorities.  "It is not enough merely to mention [] possible argument[s] in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones. . . .  Judges are not expected to be mindreaders."  Schneider v. Kissinger, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005).

B.  Application

The Court will break its application of the law here into two sections, roughly based on the arguments Plaintiffs raise in countering the ATU's Motion.  First, does Plaintiffs' suit "directly challenge the validity of an election already conducted" under Crowley, 467 U.S. at 541 n.16?  Second, if so, did Title IV actually apply to this Union's election?  If either answer is no, as Plaintiffs maintain, then its exclusivity provisions should not preempt their suit.

1.  *Challenge to Election's Validity*

The first step in deciding Defendants' jurisdictional challenge is determining whether Queen and Murray have "directly challenge[d] the validity of an election already conducted."  Id. If so, then the subject matter falls within the scope of Title IV and is presumptively covered by that Title's exclusivity provisions.  Before going to that question, however, a preliminary

concession deserves mention.  Plaintiffs wisely make no argument that, because they seek to

reinstate the June 2013 election results and challenge only Hanley's invalidation decision and the

subsequent rerun election, their suit is not a challenge to an "election already conducted," as that

term is used in § 483.  Defendant cites to ample authority holding that such a position would be

unfounded.  See Mot. at 13; Molina, 762 F.2d at 168 (plaintiff's complaint, which "seeks to

reverse the union's invalidation" of the original election and to "overturn the later two [follow on

or rerun] elections" counts as an election challenge under § 483).  For that reason, the only

question is whether Plaintiffs' suit "directly challenge[s]" that contested election and its ultimate

outcome.

A good place to begin is with the relevant election-related rights covered by Title IV,

followed by an inquiry into whether the claims asserted by Plaintiffs in Counts I and II comprise

claims that "in substance charge a breach of Title IV rights."  Calhoon, 379 U.S. at 138.

As a reminder, Title IV protects, in relevant part, the right of "every member [of a union]

in good standing [to] be eligible to be a candidate and to hold office (subject to . . . reasonable

qualifications uniformly imposed) . . . without being subject to penalty, discipline, or improper

interference or reprisal of any kind by such organization or any member thereof."  29 U.S.C.

§ 481(e).  As the Supreme Court in Calhoon succinctly explains, "[D]isputes . . . basically

relating . . . to eligibility of candidates for office[] fall squarely within Title IV of the Act and are

to be resolved by the administrative and judicial procedures set out in that Title."  379 U.S. at

141.

Given that understanding, the conclusion that Plaintiffs seek to vindicate rights that fall

under Title IV appears inexorable.  In rendering a decision, the Court must look beyond the

statutory bases Plaintiffs invoke in the Complaint and decide if the two counts "in substance"

12

charge rights protected by Title IV.  See id.; accord, e.g., Davis v. United Auto. Workers of Am.,

390 F.3d 908, 912 (6th Cir. 2004) ("'[T]he substance of the claim is controlling.'") (quoting

McGuire v. Grand Int'l Div. of Bhd. of Locomotive Engineers, 426 F.2d 504, 508 (6th Cir.

1970) ("If an individual member could bring suit by the simple expedient of framing a claim

under Title I, where the substance of the claim falls under Title IV, the comprehensive

administrative and procedural provisions of Title IV would be rendered meaningless.")); Bradley

v. Am. Postal Workers Union, 962 F.2d 800, 802 (8th Cir. 1992) (similar); Kraska v. United

Mine Workers of Am., 686 F.2d 202, 206 (3d Cir. 1982) (essential inquiry is whether "the

underlying complaint . . . is . . . more easily characterized as a Title I[] or as a Title IV[] issue").

Here, the two Counts undoubtedly do.

On its face, Count I pleads a violation of the right to be free from improper discipline

under Title I, § 411(a)(5).  See Am. Compl., ¶¶ 34-38.  But the gist of Plaintiffs' dispute is not

improper discipline per se, but rather that the "ATU disciplined Murray and Queen by deeming

them to be . . . members not in good standing and ineligible to run for Local officer positions."

Am. Compl., ¶ 37 (emphasis added).  The "discipline" matters, in other words, only insofar as it

had election- and eligibility-related consequences for Murray and Queen, and thus the dispute is

plainly one that "relat[es] . . . to eligibility of candidates for office."  Calhoon, 379 U.S. at 141.

Similarly, Count II states breach-of-contract claims under either state common law or the

Labor Management Relations Act.  See Am. Compl., ¶¶ 39-42.  But the essence of the count is

that the ATU "breached [the Constitution] by . . . determining, without any basis, that each

plaintiff was ineligible . . . for election to a Local officer position . . . ."  Id., ¶ 42.  This is

similarly a direct challenge to the validity of an election, and the fact that Count II is pled under

state common law (or, in the alternative, LMRA § 301) does not remove it from the ambit of

Title IV's exclusivity provisions.  See Davis v. UAW, 392 F.3d 834, 839 (6th Cir. 2004) (state-law wrongful-discharge claim preempted by Title IV where its resolution would require judicial pronouncement on validity of disputed election), overruled on other grounds by Blackburn v. Oaktree Capital Mgmt., LLC, 511 F.3d 633 (6th Cir. 2008); Bermingham v. Castro, No. 98-15859, 1999 WL 644342, at *2 (9th Cir. Aug. 24, 1999) (unpublished) (Title IV precludes breach-of-constitution claim brought under LMRA § 301 as "the damages that he seeks for lost income and benefits attributable to the [officer] position [he was deprived of] effectively challenge the validity of the election already conducted"); Brown v. Am. Arbitration Ass'n, 717 F. Supp. 195, 202 (S.D.N.Y. 1989) (same); Wolfson v. Newspaper & Mail Deliverers' Union of N.Y. & Vicinity, 713 F. Supp. 700, 703 (S.D.N.Y. 1989) (same).

The remedies sought by Plaintiffs also reinforce the notion that they directly challenge the validity of an election.  Under both counts they seek (a) rescission of the ATU's February 2014 invalidation decision and the Local's March 2014 rerun election, (b) reinstatement to the officer positions they would have held had the original election results not been disturbed, and (c) damages, including back pay for the wages they would have earned as officers.  See Am. Compl. at 9-11 (Prayers for Relief).  In sum, both claims are inextricably bound up in a dispute over the "eligibility of candidates for office" and thus "fall squarely within Title IV."  Calhoon, 379 U.S. at 141; see Opp. at 9 (agreeing that damages claims "flow[] from the fact that [the] ATU deemed them ineligible to run for office").

The Court's inquiry is not quite over, as Plaintiffs also appear to argue that Title IV preemption does not bar an election-related Title I claim where the plaintiff charges the union with discriminatory application of an election-eligibility rule.  See Opp. at 8 (incorporating by reference Sec. Summ. J. Opp. at 23).  As a general matter, they are right that Calhoon offered

some solace to plaintiffs whose claims follow this pattern, since the non-discrimination right

enumerated in Title I (§ 411(a)(1)) is not clearly protected by Title IV.  See Calhoon, 379 U.S. at

139.  It is nonetheless hard for the Court to see the relevance of this exception here.

Discriminatory application of election-eligibility rules in the LMRDA context means that

the union "applied the applicable provisions" of the constitution or bylaws "unequally to two

persons . . . similarly situated."  Fisher v. Wash. Teachers' Union, 350 F. Supp. 2d 69, 76

(D.D.C. 2004).  This potential escape hatch thus offers no relief to Plaintiffs, as their Amended

Complaint contains not a single reference to discriminatory application of the ATU's election-

eligibility rules.  Indeed, Plaintiffs eschewed reliance on Title I's non-discrimination provision,

§ 411(a)(1), and have never contended in any of their briefs that the ATU engaged in such

discrimination.  Instead, in contesting President Hanley's ineligibility conclusion and their

exclusion from the rerun election, Plaintiffs challenge only the ATU's "interpretation of the

applicable provisions of the [its] Constitution and Bylaws" – a claim that "must be raised under

Title IV."  Fisher, 350 F. Supp. 2d at 76 (D.D.C. 2004); accord Davis, 390 F.3d at 912 ("[T]he

allegations made by [plaintiff] do not establish that members of Region 2 were denied election-

related privileges enjoyed by UAW members in other regions.  Absent discrimination of this

kind, [plaintiff] may not maintain an action under Title I.").

Seeking to dodge the preemption bullet, Plaintiffs next make a series of cascading

arguments in the alternative, working hard to expunge from their Complaint any remedy that

might plausibly be interpreted as constituting a direct challenge to the 2013 election.  See Opp. at

8-9.  They begin by "withdraw[ing] their prayers for reinstatement" – which is no skin off their

backs since that remedy was mooted when the three-year term to which they were elected ended

on June 30, 2016.  See Sec. Summ. J. Opp. at 24.  But the fact that time has rendered a

reinstatement remedy obsolete does not detract from the fact that Plaintiffs "in substance charge a breach of Title IV <u>rights</u>." <u>Calhoon</u>, 379 U.S. at 138 (emphasis added); <u>see also</u> <u>O'Doherty v. Bhd. of Ry., Airline & S.S. Clerks</u>, 618 F.2d 484, 486 (8th Cir. 1980) (Title I claim preempted if complaint raises issues governed "predominantly" by Title IV); <u>Driscoll v. Int'l Union of Operating Engineers, Local 139</u>, 484 F.2d 682, 687 (7th Cir. 1973) (in deciding whether Title IV preempts plaintiffs' claims, court should conduct "a close analysis of the basic thrust of the complaint," as a party cannot "obtain jurisdiction by merely alleging the denial of Title I rights when Title IV rights were essentially involved").

In any event, the same conclusion would obtain even if Plaintiffs sought only back pay from the get-go.  This is because an award of back-pay damages here necessarily requires a judicial pronouncement that the challenged election – or here, the invalidity decision and subsequent rerun election – was, in fact, invalid.  <u>See</u> <u>Davis</u>, 392 F.3d at 839 (dismissing as preempted plaintiff's "state-law claims . . . including his requested remedy of back pay" where such claims "logically hinge on his assertion that he was lawfully elected"); <u>Molina</u>,762 F.2d at 167, 168 n.6 (Title I claim preempted even where plaintiffs "ask only for damages"; "[t]o award even damages in this case" would still require court "<u>to address the validity of the elections</u> to determine whether Castro Molina was entitled to the union presidency. . . .  [T]hat appellants do not seek reinstatement . . . is of little consequence.") (emphasis added); <u>Calciano v. United Bhd. of Carpenters & Joiners of Am.</u>, No. 92-5715, 1993 WL 138827, at *4 (S.D.N.Y. Apr. 23, 1993) ("Plaintiffs can only prevail on Count 3, the claim for back pay, if the court determines that the election was improper and defendants have improperly taken their offices.").  Plaintiffs cannot save their suit by slicing away their injunctive remedies to leave only their request for back pay.

In a last-ditch effort, Plaintiffs trim back their remedial request even further to include

damages only for "injury to reputation and non-economic damages flowing from the fact that [the] ATU deemed them ineligible to run for office in the June 2013 election." Opp. at 8-9. But even those damages, as Plaintiffs concede, would require the Court to pass on the validity of the ATU's decision, as they expressly state that the harms "flow[] from the fact that [the] ATU deemed them ineligible to run for office . . . ." Id. at 9. By admission, these damages also fall squarely within the scope of Title IV's exclusivity provisions.

In sum, looking at Plaintiffs' Amended Complaint as a whole, the Court concludes that they mean to pursue a direct challenge to an election already completed. For that reason, as long as that election is governed by Title IV, their suit falls squarely within its "exclusive" remedial scheme. See 29 U.S.C. § 483.

### 2. *Title IV Applied to Election*

Plaintiffs' second argument is a bit more original, but it meets with the same fate. In essence, they contend that because the challenged election at issue "Was Not Governed by Title IV[,] . . . Title IV Exclusivity Does Not Deprive This Court Of Jurisdiction." Opp. at 6. This takes some careful unpacking, as the argument Plaintiffs make in countering Defendants' position that Title IV does cover the challenged election is a narrow one indeed.

Before getting there, however, a little background will give some much-needed context to these dueling positions. Generally speaking, the LMRDA does not apply to unions – be they locals, intermediate bodies, or parents – whose membership consists entirely of public-sector employees. See 29 U.S.C. § 402(e), (i) (defining main subject of statute – i.e., "labor organization[s]" – by reference to "employer," and excluding "the United States" and "any State or political subdivision" from definition of "employer"); Hester v. Int'l Union of Operating Eng'rs, 818 F.2d 1537, 1542 n.12 (11th Cir. 1987) (explaining congressional justification for

excluding wholly public-sector unions from LMRDA coverage), <u>vacated on other grounds</u>, 488 U.S. 1025 (1989).  That neat distinction between LMRDA-covered and non-covered bodies does not entirely hold, however, when it comes to "mixed" unions, which include parent bodies, like the ATU, comprising both private- and public-sector locals.  <u>See</u> <u>Murray I</u>, 2014 WL 11281392, at *6 (explaining LMRDA statute does "protect members of [government-only] locals in their dealings with a parent union that is subject to the LMRDA") (citing <u>Wildberger v. Am. Fed'n of Gov't Employees</u>, 86 F.3d 1188, 1192-93 (D.C. Cir. 1996)).

For such mixed unions, Title IV does apply to non-covered locals' elections where such elections also result in the selection of persons who, by virtue of their office in the local, also serve as delegates to a mixed parent convention.  In other words, where someone is simultaneously elected as a local's officer <u>and</u> an *ex officio* delegate to a mixed parent's convention, Title IV regulates the election.

Longstanding Department of Labor regulations bear this out: when it comes to a public-sector local or other unit that falls under a mixed-parent umbrella, even if it "do[es] not meet the definition of a labor organization," to the extent that it "participate[s] in the election of officers of a national or international labor organization . . . <u>through delegates</u> to the convention" of the parent body, "the provisions of title IV are, nevertheless, applicable to the election of such delegates." 29 C.F.R. § 452.124 (emphasis added); <u>see also</u> § 451.3(a)(4) ("[T]he locals which are composed entirely of government employees [are not] subject to the [LMRDA], although elections in which they participate for national officers or <u>delegates</u> [are] so subject."); § 452.12 (similar).

Of course, a few conditions must be satisfied here before Title IV kicks in.  First, the parent's constitution must provide for the election of delegates *ex officio*.  <u>See</u> 29 C.F.R.

§ 452.120 (allowing for election of *ex officio* delegates if "so provide[d]" by parent constitution);

Theodus v. McLaughlin, 852 F.2d 1380, 1387 (D.C. Cir. 1988) (affirming rule as reasonable).

The parties here agree that, theoretically speaking, the ATU Constitution so provides.  See Mot.

at 1-2 (citing ATU Constitution and General Laws, or "CGL," § 6.7); Opp. at 2 ("[B]oth the

ATU Constitution and Local 1300's Bylaws also provide that, if certain criteria are satisfied, the

persons elevated to certain Local 1300 officer positions serve *ex officio* as delegates to ATU's

triennial Convention.").  Second, the local union's bylaws need to similarly authorize election of

*ex officio* delegates.  See 29 C.F.R. § 452.120.  Once again, the parties agree that Local 1300's

bylaws do just that – at least as they relate to the office of the President.  See Mot. at 3; Opp. at

3; ECF No. 56-8 (Local 1300 Bylaws), § 7.

　　　　Keeping all of this in mind, Defendants maintain that Title IV governed the election

dispute here – a position that is supported by the caselaw.  See, e.g., Chao v. Amalgamated

Transit Union, AFL-CIO, CLC, 141 F. Supp. 2d 13, 16 (D.D.C. 2001) ("If . . . a non-LMRDA

local union elects delegates to attend a [mixed parent] convention . . . , and such delegates have

the power to nominate and vote for officers of that international organization, then the process by

which the non-LMRDA local unions elect delegates is regulated by the Act."); Teamsters For A

Democratic Union v. Sec'y, Dep't of Labor, 810 F.2d 301, 302 (D.C. Cir. 1987) ("[A]ppellants

are essentially challenging delegate eligibility requirements for national conventions to elect

union officers under Title IV[;] . . . [a]ccordingly, the appellants are limited to the post-election

remedies provided in . . . § 482); Averhart v. Commc'ns Workers of Am., No. 10-6163, 2016

WL 2625326, at *3 (D.N.J. May 9, 2016) ("[W]hen a public sector-only union like Local 1033

conducts an election for delegates to a parent union's convention, and that parent union is

covered by the LMRDA . . . then the LMRDA's procedural requirements for electing delegates

applies."). [1]

Plaintiffs do not contest this general principle – *i.e.*, that Title IV covers officer elections for government-only locals when those same elections provide for the selection of *ex officio* delegates to a mixed parent's convention.  See Opp., Attach. 1 (Affidavit of Paul Evelius), ¶ 4. Instead, they claim that certain facts specific to this election wrest their challenge from the clutches of Title IV.  None of their attacks, however, proves persuasive.

Murray and Queen first argue that even though Local 1300's bylaws provided for the election of *ex officio* delegates, no such delegates were in fact elected.  This was because the ballots cast in the June 2013 election erroneously failed to comply with the ATU Constitution's requirement that "the ballot must state 'and Convention Delegate' or 'and Alternate Delegate', as appropriate, after each such office."  Opp. at 7 (quoting CGL § 6.7).  This error – which Defendant "does not dispute" occurred, see Reply at 2 – created quite a stir in the run-up to the ATU's 2013 convention and ultimately ended with Local 1300's delegation being credentialed at the convention as "guests[] instead of [as] delegates."  Opp. at 3-5 (citing Opp., Attach. 2 (Affidavit of Janice Murray)).

Plaintiffs thus argue that, since the 2013 election did not produce functional *ex officio* delegates, the Secretary had no Title IV authority to intervene in that particular election dispute. They offer no citations to statutes, regulations, or cases to back this argument up, choosing to rely instead on the persuasiveness of their own syllogism that because "the ballot used for the June 2013 election did not state 'and Convention Delegate' or 'and Alternate Delegate,' . . . Title IV did not govern the June 2013 election."  Opp. at 7.

_____

[1] In cursorily dealing with this issue without briefing from the parties, the Court erred in previously stating that Title IV did not govern the election of Local 1300 officers.  See Murray I, 2014 WL 11281392, at *6.

Defendant, in response, considers all of these details rather beside the point, arguing that the Secretary's Title IV authority turns only on whether the two conditions stated in existing Department of Labor regulations were satisfied, <u>not</u> on whether an otherwise-covered election was flawed in its execution.  Defendant has the better argument on this point.

The Secretary's regulations clearly state:

> Officers of labor organizations who have been elected by secret ballot vote of their respective memberships may, by virtue of their election to office, serve as delegates to conventions at which officers will be elected, if the <u>constitution</u> and <u>bylaws</u> of the labor organization so provide.

29 C.F.R. § 452.120 (emphasis added); <u>accord</u> § 452.12 (LMRDA does not govern "locals composed entirely of government employees not covered by the Act, except with respect to . . . the election of delegates to a convention of such parent organization, or to an intermediate body to which the requirements apply").  Both the ATU Constitution and the Local 1300 bylaws "so provide[d]" for the election of *ex officio* delegates.  Those are the only two conditions that must be satisfied.

Other language in § 452.120 reinforces this point, as the rule specifically goes out of its way to note that "[i]n such cases" – *i.e.*, when officers are also elected as delegates *ex officio* – "it is <u>advisable</u> to have a statement to this effect included on the ballots."  <u>Id.</u> (emphasis added).  The rule thus expressly declines to require that locals' ballots include the notice language missing from the June 2013 ballots, even if the Secretary believes that doing so is a good idea.

To be sure, the ATU Constitution does make such notice mandatory – a point on which the parties agree.  But it makes no sense to argue, as Plaintiffs do, that the "ATU's Constitution 'provides' [for election of *ex officio* delegates] <u>only if</u> the ballots used in that election include the Delegate Phrase."  Sur-Reply at 2.  Plaintiffs cannot invent an additional <u>regulatory</u> prerequisite

to the exercise of LMRDA jurisdiction.  In any event, the ATU Constitution does not, as

Plaintiffs suggest, make its grant of authority – *i.e.,* that an ATU local "may provide in local

bylaws" for *ex officio* election of delegates, <u>see</u> ATU Constitution § 6.7 – conditional upon the

effective inclusion of notice on electoral ballots.  On the contrary, the Constitution's notice

requirement is distinctly removed from that delegation of authority and, in fact, presumes that the

local has already exercised it: <u>"Where [local] bylaws provide</u> that local officers and executive

board members may be delegates to Conventions of the ATU by virtue of their office, the ballot

must state 'and Convention Delegate' or 'and Alternate Delegate', as appropriate, after each such

office."  <u>Id.</u> (emphasis added).

 In addition, Plaintiffs' reading would subject the Secretary's authority to the factual

vagaries of each and every election.  Government oversight of a given election could be

precluded, for instance, by a slip up at the printing press or by the decision of an unscrupulous

individual overseeing the balloting process.  Plaintiffs' argument, moreover, would not be

limited to just this type of balloting error; under their theory, any chain of events that resulted in

officers' being deprived of a delegate role at the convention would preclude Title IV coverage.

Plaintiffs' logic, which would hold the Secretary's jurisdiction in abeyance until a Court first

nailed down the unpredictable and messy facts of every contested election, has no mooring in the

language of either Title IV or the Department of Labor's regulations, and no basis in the caselaw

or the Secretary's decisions.  The Court declines to adopt it here.

 Plaintiffs' next move is to concede that if <u>Murray</u>'s election challenge falls under Title

IV, <u>Queen</u>'s does not.  <u>See</u> Opp. at 9 ("[R]egardless of whether or not Title IV applied to that

aspect of the June 2013 election [concerning Murray], it did not apply to that aspect of the

election in which Plaintiff Queen sought the Vice President position.").  They make this

argument because Local 1300's bylaws expressly provide that while the President serves as an *ex officio* delegate, the Vice President is not given such a role.  See Local 1300 Bylaws § 7.  From this premise, Plaintiffs imply that because Queen was never intended to be elected as an *ex officio* delegate, it must mean that Title IV was inapplicable as to him.

This is purely a straw-man argument, for it depends on the assumption that some portions of a given election might be covered by Title IV while others would not be.  And from this assumption, Plaintiffs then make the dubious inference that Queen would thus have been denied access to a Title IV remedy.  Such positions have no basis in law.

Title IV remedies do not toggle on or off depending on the status of a given candidate; on the contrary, they apply to an election as a whole.  See 29 U.S.C. § 483 ("The remedy provided by this subchapter for challenging an election already conducted shall be exclusive.") (emphasis added).  Indeed, Title IV speaks of elections as a unified event.  An individual who believes there has been an irregularity in "the election" may challenge it by complaining to the Secretary, who may, if he thinks it necessary, file suit "to set aside the invalid election."  See id. § 481(a), (b).  If a district court agrees with that assessment, it may "declare the election, if any, to be void and direct the conduct of a new election under supervision of the Secretary."  Id. § 481(c); accord 29 C.F.R. §§ 452.135, 452.136.  The Supreme Court in Crowley, moreover, explained that such unified treatment of elections was by congressional design:

> Congress made suit by the Secretary under Title IV the exclusive postelection remedy for challenges to an election "(1) to protect unions from frivolous litigation and unnecessary judicial interference with their elections, and (2) to centralize in a single proceeding such litigation as might be warranted with respect to a single election."  Thus, exclusive postelection enforcement by the Secretary serves "as a device for eliminating frivolous complaints and consolidating meritorious ones."

Crowley, 467 U.S. at 549 (quoting Trbovich, 404 U.S. at 532, 535).

23

More importantly, when Title IV governs an election, <u>any member</u> of the union may lodge a complaint with the Department of Labor to set the Title IV procedures in motion.  <u>See id.</u> § 482(a); 29 C.F.R. § 452.135(a) ("Any member of a labor organization may file a complaint . . . alleging that there have been violations of requirements of the Act concerning the election of officers, delegates, and representatives . . . .").  "Any member," of course, includes Queen, who could have lodged a complaint with the Secretary after receiving either the ATU's February 2014 invalidation decision or after learning the results of the March 2014 re-run election.  <u>See, e.g.</u>, <u>Chao v. Local 743, Int'l Bhd. of Teamsters</u>, 467 F.3d 1014, 1017 (7th Cir. 2006) ("[A]ny member of a union who believes that Title IV has been violated, and who has first exhausted the remedies available to him or her under the labor organization's constitution or bylaws may file a complaint with the Secretary . . . .").  Because Queen had access to a Title IV remedy, then, it makes no sense to argue, as Plaintiffs do, that he must be entitled to press on under Title I, as "[t]o hold otherwise would result in a 'whip-saw' effect whereby plaintiffs would be denied a remedy under either Title I or Title IV."  <u>Knisley v. Teamsters Local 654</u>, 844 F.2d 387, 391 (6th Cir. 1988).  On the contrary, neither Title IV nor its implementing regulations suggest that because Queen himself was never intended to be elected delegate, his access to a Title IV remedy vanishes.

For this reason, the only three cases Queen cites – <u>Knisley</u>, 844 F.2d 387, <u>BLE Int'l Reform Comm. v. Sytsma</u>, 802 F.2d 180 (6th Cir. 1986), and <u>Fiori v. Truck Drivers Union Local 170</u>, 130 F. Supp. 2d 150 (D. Mass. 2001) – are inapposite.  He relies on them for the proposition that where Title IV does not apply to a given election, its exclusivity provision is not activated.  <u>See</u> Opp. at 9.  But, as the Court has just explained, Plaintiffs' election challenge – all of it – does fall under Title IV, meaning neither Queen nor Murray was prevented from pursuing a Title

IV remedy.

In any event, the cited cases do not support the proposition Plaintiffs advance.  In <u>Kinsley</u> and <u>Fiori</u>, for instance, the plaintiffs had already lodged complaints with the Secretary, who had also already concluded that Title IV did not apply in each case.  Both courts held that Title IV did not preclude the plaintiffs' other election-related claims "[b]ecause the Secretary ha[d] determined that Title IV d[id] not apply."  <u>Knisley</u>, 844 F.2d at 388, 391 ("[W]e conclude that plaintiffs should be allowed to proceed with their Title I claims against the Union <u>where the Secretary has previously determined that Title IV does not apply</u>."); <u>see</u> <u>Fiori</u>, 130 F. Supp. 2d at 155 ("When the Secretary determines that a particular union office is not covered by Title IV, the exclusivity provision of Title IV does not apply . . . .").  <u>BLE International</u> is similarly distinct. In that case, the plaintiffs complained about the manner in which their union had carried out the recall of the parent union's president.  But it was clear from the face of the Secretary's own regulations that recall elections were not covered by Title IV.  <u>Compare</u> <u>BLE International</u>, 802 F.2d at 191, <u>with</u> <u>Chao</u>, 141 F. Supp. 2d at 16 (election of *ex officio* delegates covered by Title IV).

The conclusion that the challenged election is subject to Title IV makes sense for another reason.  If Title IV were wholly inapplicable to the election dispute at issue here because it pertained only to a non-"labor organization" election – *i.e.*, one held by a public-sector union – it would seem inevitable that Plaintiffs' Title I claim, too, must fall by the wayside, as it arises from the same election-related conduct.  The provision that Plaintiffs invoke in Count I, § 411(a)(5), guarantees a right to be free from improper discipline only to "member[s] of any labor organization."  It would be nonsensical to conclude that "labor organization" means one thing under Title I but something different under Title IV, where the statute, caselaw, and

regulations make no such distinction.  See § 402(e) (excluding from the definition of "labor organization" "the United States . . . or any State or political subdivision thereof"); 29 C.F.R. § 451.3(a)(4); cf. Wildberger, 86 F.3d at 1193 ("'[I]f a union is subject to the LMRDA, then all of its members, whether employed by the private or public sector, are protected by the Act's bill of rights.'") (quoting Hester, 818 F.2d at 1542 n.13).

As a last-ditch argument, Plaintiffs ask that the Court grant them the opportunity "to conduct discovery before the Court rules on [the] ATU's motion," Opp. at 1, believing that additional facts would help shore up their argument that the officers elected during the 2013 election process were not, in fact, properly elected as ex officio delegates.  See Evelius Aff., ¶¶ 4-5.  But the Court's conclusion that Title IV applied to the election at issue here does not require resolution of any factual issues.  Nor does Defendant even dispute that the ballots failed to contain the necessary notice language as required by the ATU Constitution, or that Murray was not seated as a delegate by the ATU (whether properly or not).

In sum, Title IV of the LMRDA deprives this Court of jurisdiction over Plaintiffs' challenge to the ATU's 2013 election-invalidation decision and the subsequent re-run election, and because Plaintiffs' request for jurisdictional discovery is immaterial to resolution of this issue, the Court will deny it.

**IV.**     **Conclusion**

For these reasons, the Court will grant Defendant's Motion to Dismiss for lack of subject-

matter jurisdiction.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:   September 2, 2016